REMINGTON RAND, INC., Plaintiff, *v.* INTERNATIONAL BUSINESS MACHINE CORPORATION, Defendant.

Supreme Court, Special Term, New York County, November 26, 1937.

*David L. Podell* and *Hays, Podell & Shulman* [*David L. Podell* and *Mortimer Feuer* of counsel], for the plaintiff.

*Davies, Auerbach & Cornell* [*Martin A. Schenck* of counsel], for the defendant.

ROSENMAN, J. This is an action originally brought by the plaintiff to rescind a contract entered into between the parties' predecessors on March 4, 1931. Since the parties are the successors

to the contract, they will be referred to, in this opinion, as though they were the original signatories thereto.

The plaintiff and defendant each owned certain patents relating to non-manual automatic sorting and tabulating machines. They each do an intrastate and an interstate business. Disputes arose between them with respect to certain moneys due, and to alleged infringements of the respective patents owned by each. Desiring to settle these controversies and to avoid further litigation as well as to discharge the liability of each to the other, the parties executed the agreement aforementioned.

The contract provided, among other things, that the disputes and alleged patent interferences be settled; that the parties cross-license each other's use of their respective present and future patents in the manufacture of their own respective machines; that the parties could lease, but not sell, their respective sorting and tabulating machines upon terms of rental not less than those stated in a schedule annexed to the agreement; that neither party could solicit users of the machines of the other party for the purpose of selling cards (necessary for the use of the machines) to them, unless such prospective purchaser were the user of the machines of both parties; that the scheduled prices for the rental of machines would be maintained, and that the parties would do nothing which might effect a lowering of those prices; that no free use of cards or machines would be given except for demonstration or educational purposes; that no rebates or concessions would be given which would affect the schedule of minimum prices; and that the agreement was to continue for five years.

It was also provided that the plaintiff pay to defendant the sum of $350,000 upon the signing of the agreement for a mutual release and discharge of all prior claims, and to pay to defendant the further sum of $25,000 annually for five years. Under certain conditions the parties had a right to terminate and cancel the contract, in which event the balance of the moneys then due would immediately become payable. The defendant canceled the agreement for failure of the plaintiff to pay the third installment of $25,000.

In answer to plaintiff's complaint, defendant counterclaimed for $75,000 allegedly due under the last-mentioned provision. In its reply, plaintiff claimed that the contract was void as being within the prohibitions of the Sherman Anti-Trust Law, the Clayton Act and the New York Donnelly Act, and argued that the invalidity extended to the contract in its entirety since the annual payments provisions could not be separated from those creating monopoly and restraint of trade.

Prior to the trial of the action, the plaintiff withdrew its complaint on stipulation, so that the case was tried as though the counterclaim of the defendant were the original complaint and the plaintiff's reply were the original answer.

I conclude that the agreement of March 4, 1931, is illegal in that it violates the Clayton Act (38 U. S. Stat. at Large, 730, as amd.; U. S. Code, tit. 15, §§ 12–27) and Sherman Anti-Trust Law (26 U. S. Stat. at Large, 209; U. S. Code, tit. 15, §§ 1–7).

If the contract were only a settlement of patent disputes and a cross-licensing agreement, as the defendant claims, it would be valid. For " it is not illegal for the primary defendants to cross-license each other and the respective licensees; and * * * adequate consideration can legally be demanded for such grants." (*Standard Oil Co.* v. *United States*, 283 U. S. 163, 170.)

But here other decisive elements are present. Each party to this contract agreed that it would not sell its tabulating and sorting machines to any one, but only lease them; that the leasing was to be on terms and prices not less than those stated in Schedule A annexed to the contract; that such prices would be maintained for five years; that they would do nothing to effect a lowering of such prices; and that neither party would solicit the other's customers in the sale of cards.

It further appears that the contracting parties between them control all of the automatic, non-manual, tabulating and sorting machine business in the United States and all the patents pertaining thereto. Between them they owned substantially all of the automatic tabulating machines in use in the United States. No other machine made can, singly or in combination with other machines, perform the functions of the machines of these parties without the intervention of additional manual operation. The parties here are also the only concerns which manufacture and sell the tabulating cards used in their machines.

The effect of the agreement in the light of the evidence is clearly to restrain all competition between these parties and to create between them a complete monopoly of the industry. The agreement is, therefore, invalid. The fact that patents are involved makes no difference, for " the lawful individual monopolies granted by the patent statutes cannot be unitedly exercised to restrain competition." (See *Standard Oil Co.* v. *United States, supra,* at p. 174.)

In the case of *National Harrow Co.* v. *Hench* (76 Fed. 667; affd., 83 id. 36) a number of different manufacturers, making about ninety per cent of the spring-tooth harrows in the United States under different patents, agreed to organize a corporation

to which they all assigned their present and future patents, and from which they all took a license to make and sell harrows subject to scheduled minimum terms and prices. The court held the agreements illegal, stating (p. 38): " The provision for licenses is made necessary by the transfers of title, and is simply another part of the scheme for combination and control of the business of the several patentees. The result would be the same in legal contemplation if the corporation and licenses had been dispensed with, and the contract had provided simply, as it does, for combination and restraint of competition. That such a contract would be unlawful seems clear. \* \* \* The fact that the property involved is covered by letters patent is urged as a justification; but we do not see how any importance can be attributed to this fact. Patents confer a monopoly as respects the property covered by them, but they confer no right upon the owners of several distinct patents to combine for the purpose of restraining competition and trade. Patented property does not differ in this respect from any other. The fact that one patentee may possess himself of several patents, and thus increase his monopoly, affords no support for an argument in favor of a combination by several distinct owners of such property to restrain manufacture, control sales, and enhance prices. Such combinations are conspiracies against the public interest, and abuses of patent privileges. The object of these privileges is to promote the public benefit, as well as to reward inventors. The suggestion that the contract is justified by the situation of the parties — their exposure to litigation — is entitled to no greater weight. Patentees may compose their differences, as the owners of other property may, but they cannot make the occasion an excuse or cloak for the creation of monopolies to the public disadvantage."

The cases relied on by the defendant do not uphold its contention that the agreement is valid.

The case of *Bement* v. *National Harrow Co.* (186 U. S. 70), upon which the defendant places great reliance, is distinguishable from the case at bar. The only contracts which were before the court in that case were the agreements called A and B. By these contracts, the plaintiff granted licenses to the defendant to manufacture, market and sell certain harrows under its patents. The agreements provided, among other provisions, that the defendant pay a royalty of one dollar for each article sold; that defendant was not to sell on commission, grant rebates or depart from the stipulated sale prices in the contract; that the plaintiff should have the right to reduce selling prices and royalties; that the defendant was not to manufacture any other harrow than those granted under the license;

that liquidated damages for violations were to be the sum of five dollars for any other article sold by the defendant; that the plaintiff would not license any one else under the patents for which a license was granted to the defendant; that any departure from the license was to be considered an infringement; that the license was not assignable.

The referee, who was appointed by the Supreme Court in New York to hear and determine, found that these contracts were " good and valid contracts, founded on adequate considerations and were reasonable in their provisions; contracts A and B imposing no restraints upon the defendant beyond those which the parties had a right, from the nature of the transaction, to impose and accept." The defendant there contended, however, that these two agreements arose out of, and were a continuation of, other contracts made between plaintiff and other licensees, which had theretofore been held invalid as being in restraint of trade and creating a monopoly. The court refused to pass on such contention because of the failure of the referee to include such facts in his findings. The United States Supreme Court stated that it was bound by the record before it, and was " concluded by the findings of fact made in a State court." The review by the Supreme Court, therefore, was circumscribed by the absence of findings of fact necessary to bring before it the entire situation, including the connection between the invalidated contracts and contracts A and B.

" The omission of the referee to find from the evidence that the contracts A and B were a continuation of former contracts held to have been void, and that there were in fact other manufacturers of harrows who had entered into the same kind of contracts with plaintiff as those denominated A and B, and that there was a general combination among the dealers in patented harrows to regulate the sale and prices of such harrows, furnishes no ground for this court to assume such facts. The contracts A and B are to be judged by their own contents alone and construed accordingly." (Bement v. Nat. Harrow Co., 186 U. S. 70, 85.)

It was for that reason that " the case was treated as one between the particular parties, the one granting and the other receiving a right to use a patented article with conditions suitable to protect such use and secure its benefits." (Standard Sanitary Mfg. Co. v. United States, 226 U. S. 20, 48, in discussing the Bement case.)

The Court of Appeals in New York stated that its review also was limited to the two contracts before it, since the Appellate Division had failed to say that its reversal of the referee's determination was on the facts as well as the law. (National Harrow Co. v. Bement & Sons, 163 N. Y. 505.)

It appears, therefore, that the United States Supreme Court did not, and could not, pass upon the question of whether these contracts A and B, in conjunction with others not before it, formed an illegal combination in violation of the act. " If such similar agreements had been made, and if, when executed, they would have formed an illegal combination within the act of Congress, we cannot presume for the purpose of reversing this judgment, in the absence of any finding to that effect, that they were made and became effective as an illegal combination. As between these parties, we hold that the agreements A and B actually entered into were not a violation of the act. We are not called upon to express an opinion upon a state of facts not found." (*Bement* v. *National Harrow Co., supra*, p. 95.)

The general statements in the opinion that " An owner of a patent has the right to sell it or to keep it; to manufacture the article himself or to license others to manufacture it; to sell such article himself or to authorize others to sell it " (p. 88); and that " The general rule is absolute freedom in the use or sale of rights under the patent laws of the United States. The very object of these laws is monopoly, and the rule is, with few exceptions, that any conditions which are not in their very nature illegal with regard to this kind of property, imposed by the patentee and agreed to by the licensee for the right to manufacture or use or sell the article, will be upheld by the courts. The fact that the conditions in the contracts keep up the monopoly or fix prices does not render them illegal " (p. 91); all these statements were made with respect to the record actually before the court which contained only agreements between one patentee and one licensee. The said general statements were expressly stated by the court not to be necessarily applicable to a state of facts where other contracts had been made with other licensees covering practically the entire industry.

In the case of *Standard Oil Co.* v. *United States* (283 U. S. 163), also relied on by the defendant, there were contracts between four patentees (defendants among others), entered into in order to compose differences and litigation between them over alleged patent infringements involving the manufacture of gasoline by the patented cracking process.

By these agreements each defendant was released from liability for any past infringement of patents of the others, and each acquired the right to use these patents thereafter in its own process. Each was empowered to extend to independent concerns, licensed under its process, releases from past, and immunity from future, claims of infringements of patents controlled by the other defendants.

And each was to share in some fixed proportion the fees received under these multiple licenses.

As above indicated, the court held that cross-licensing for adequate considerations was not invalid. But the court pointed out: " The rate of royalties may, of course, be a decisive factor in the cost of production. If combining patent owners effectively dominate an industry, the power to fix and maintain royalties is tantamount to the power to fix prices. * * * Where domination exists, a pooling of competing process patents, or an exchange of licenses for the purpose of curtailing the manufacture and supply of an unpatented product, is beyond the privileges conferred by the patents and constitutes a violation of the Sherman Act. The lawful individual monopolies granted by the patent statutes cannot be unitedly exercised to restrain competition " (p. 174).

Here the parties did not use merely the means of royalties to fix prices; they definitely and directly fixed the prices at which the respective machines could be leased.

The facts in the *Standard Oil* case differ from the facts in this case in one very vital element, and it is that difference which must lead to a different result here. The plaintiff and the defendant in the present case completely dominate the industry with respect to non-manual automatic sorting and tabulating machines. The only competition prior to March 4, 1931, was strictly between these parties to the agreement. The effect of the agreement was to fix prices, create monopoly, and restrain trade in that industry. In the *Standard Oil* case the decision upholding the agreements was based on the fact that the cross-licensing agreements did not eliminate competition. The proportion of gasoline manufactured by the cracking process by all patentees of this process or their licensees was only twenty-six per cent of the total gasoline manufactured in the industry by all processes (p. 176). And the entire amount of gasoline manufactured by the cracking process by these defendants and their licensees was only fifty-five per cent of all the gasoline produced by the cracking process (p. 175). Therefore, these defendants controlled only fourteen per cent of the entire gasoline industry. Control of the industry by the defendants in that case, therefore, was lacking, since no proof was given to show that by reason of the monopoly of the cracking process patents, the defendants fixed prices by dominating " the remainder of the total gasoline produced from all sources " (p. 177).

The court undoubtedly would have come to a different conclusion had there been domination of the industry and fixing of prices. The distinction is that here there was complete control of the industry, whereas in the *Standard Oil* case there was no such control.

Nor is there anything said in the case of *United States* v. *General Electric Co.* (272 U. S. 476) that is contrary to the distinctions here pointed out. There, as in the *Bement* case, there was merely the control of prices between one patentee and its agents and licensee. The holding of the court was merely that: " The owner of an article, patented or otherwise, is not violating the common law, or the Anti-Trust Law, by seeking to dispose of his article directly to the consumer and fixing the price by which his agents transfer the title from him directly to such consumer " (p. 488).

Another example of restraint of competition which went beyond the privileges of patent monopoly and which was declared invalid by the courts is present in the case of *Standard Sanitary Mfg. Co.* v. *United States* (226 U. S. 20). There the trade was " practically controlled from producer to consumer * * * by the co-operation of 85% of the manufacturers." It was also shown " that 90% of the jobbers in number and more than 90% in purchasing power joined the combination." It was, therefore, held that the licensing contracts between the manufacturers and patentee, which fixed the prices at which the jobbers could sell " transcended what was necessary to protect the use of the patent or the monopoly which the law conferred upon it. They passed to the purpose and accomplished a restraint of trade condemned by the Sherman Law " (p. 48).

The defendant contends that the Federal laws prohibiting monopoly and restraint of trade are not available to plaintiff since this action is brought in a State court; that in order to have the benefit of the protection of those laws an action should have been brought in the Federal courts. However, the defendant overlooks the distinction applicable to the situations wherein a party seeks to use the Federal laws as a basis for affirmative relief in our courts and where he passively interposes such laws merely as a defense to an action brought against him.

It is true that the Federal laws cannot be used as a basis for affirmative relief in our State courts, since jurisdiction with respect to the enforcement of those laws lies exclusively in the Federal courts. (*Eastman Kodak Co.* v. *Powers Film Products, Inc.*, 189 App. Div. 556, 560; *Locker* v. *American Tobacco Co.*, 121 id. 443, 449; affd., 195 N. Y. 565; *Barns* v. *Dairymen's League Co-operative Assn., Inc.*, 220 App. Div. 624, 635; *Marsich* v. *Eastman Kodak Co.*, 244 id. 295, 297; affd., 269 N. Y. 621.) However, a *defense* that a cause of action does not lie by reason of a violation of the Federal laws *is* available in an action brought in the courts of this State. (*Matter of Metro-Goldwyn-Mayer Distributing Corp.*, 150 Misc. 408; *Metropolitan Opera Co.* v. *Hammerstein*, 162 App. Div.

691; affd., 221 N. Y. 507; *Ainsworth* v. *Cooper Underwear Co.*, 227 App. Div. 837.) (See, also, *Butterick Publishing Co.* v. *Mistrot-Munn Co., Inc.*, 167 id. 632; affd., 217 N. Y. 678.)

It is interesting to note that even in the *Bement* case (*supra*), relied on so greatly by the defendant here, the *defense* that the contract was void as being within the prohibition of the Federal statutes was raised originally in the courts of this State (paragraph " eleventh," amended complaint, fol. 191, p. 64; fol. 1795, p. 599, case on appeal in the Court of Appeals). It was also one of the specific questions raised on appeal (fols. 1834 and 1835, p. 612, case on appeal). It was argued by both counsel in the Court of Appeals (point III of defendant-respondent's brief, pp. 47–51; pp. 31–33 of plaintiff-appellant's replying brief). The United States Supreme Court said, in passing, in partial agreement with the contention that only the Attorney-General could avail himself of the law in a direct proceeding: " but that does not prevent a private individual when sued upon a contract which is void as in violation of the act from setting it up as a defense, and we think when proved it is a valid defense to any claim made under a contract thus denounced as illegal." (*Bement* case, *supra*, p. 88.)

The plaintiff here seeks no affirmative advantage by reason of the statute. The illegality of the contract under the statute is alleged in the reply as a defense to the counterclaim. Under such circumstances, and under the authorities, the defendant's claim cannot be sustained that the defense is invalid.

The contract is void not only under the Federal statutes but also under section 340 of the General Business Law, known as the Donnelly Anti-Trust Act. The purpose of the contract was complete control and domination of the industry, curtailing of competition, preventing " the free exercise of any activity in this State in the manufacture, production, transportation, marketing or sale in this State or in the supply or price of any such article, product, commodity, service " within the prohibition of that statute. The same reasons which result in the conclusion that the contract violates the Federal laws, impel a similar holding with respect to the Donnelly Anti-Trust Act, irrespective of Federal court precedents. (See *Cummings* v. *Union Blue Stone Co.*, 164 N. Y. 401; *Cohen* v. *Berlin & Jones Envelope Co.*, 166 id. 292; *Straus* v. *American Publishers' Assn.*, 85 App. Div. 446; affd., 177 N. Y. 473.)

There remains one more point for discussion. The defendant claims that, irrespective of the alleged illegality of the contract, the provision for the annual payments required to be made by the plaintiff is separable from the rest of the contract, and that the plaintiff is now liable therefor. The plaintiff denies such separability.

It is well settled that a contract wholly based on an illegal consideration is wholly unenforcible. At times, however, a contract may be divisible by reason of its containing both legal and illegal provisions. A separation of the two will be attempted by the courts in a proper case; but where the illegality pervades the entire agreement the courts will abstain from such separation and refuse affirmative relief. (*Saratoga County Bank* v. *King*, 44 N. Y. 87; *Arnot* v. *Pittston & Elmira Coal Co.*, 68 id. 558; *Manson* v. *Curtis*, 223 id. 313.)

The general rule is stated as follows in 3 Williston on Contracts (§ 1780, at p. 3090): " The problem of partly illegal contracts quite commonly arises where it is not a promise which is illegal but part of the consideration. Where there is a single consideration for one or more promises and any part of the consideration is illegal, the promises are wholly unenforcible. And the same result must follow even though there are several considerations, some of which are legal, if the legal considerations are not apportioned to corresponding promises, for otherwise it is impossible to maintain an action on any of the promises without basing it to some degree upon the illegal portion of the consideration. Where, however, not only is the consideration separable into legal and illegal portions, but also the promises are correspondingly apportioned; that is, where the contract may properly be called divisible, it has been held that recovery may be had upon the promises which are supported by the legal portions·of the consideration; and subject to a qualification similar to that stated in the preceding section, this is sound."

Each case, however, must be determined on its precise facts. In the cases cited by defendant the legal principles remain the same; but the conclusions reached by the courts, contrary to the cases above cited, are the result of different states of facts.

In *Central New York Tel. & Tel. Co.* v. *Averill* (199 N. Y. 128) the court severed the valid from the invalid portions of the contract because the two were held to be separable, and the lawful consideration was not invalidated by reason only of the unlawful promise having been made at the same time.

In *Saratoga State Waters Corp.* v. *Pratt* (227 N. Y. 429) the court found as a fact that the covenant concerning arbitration " manifestly, is not so interwoven with the other agreements of the instrument as to affect its integrity and validity," and that such " clauses certainly do not, as claimed by the defendant, inoculate the entire instrument with illegality " (p. 441). In *Armstrong* v. *American Exchange Bank* (133 U. S. 433) the court came to a conclusion similar to that of the Court of Appeals in the

*Central New York Tel. & Tel. Co.* case (*supra*) by saying (at p. 469): " An obligation will be enforced, though indirectly connected with an illegal transaction, if it is supported by an independent consideration, so that the plaintiff does not require the aid of the illegal transaction to make out his case."

I conclude from a reading of the entire agreement that the consideration for the annual payments to be made by the plaintiff was not merely the settlement of past claims arising from prior patent infringement suits, but also all the benefits of the cross-licensing, price-fixing and competition-eliminating provisions of the agreement. The consideration was a combination of all these; no one consideration alone can be said to have been intended to be sufficient to sustain the agreement with respect to annual payments. There is nothing to show that these annual payments would have been promised by the plaintiff without all the other advantages it was going to receive from the remaining illegal provisions. In fact, the more reasonable inference is directly to the contrary.

The mutual release from past damage claims arose, according to the terms of the agreement, upon the payment of the original $350,000 by the plaintiff to the defendant. The license from the plaintiff to the defendant is stated to be only in " part consideration" for the cross-license from the defendant to the plaintiff. The inference is reasonable that the $25,000 which had to be paid for each of the five years during which ·the agreement ran was the remainder of the consideration in conjunction with its own licensing of the defendant. The plaintiff was apparently paying this extra sum of money for each of the five years of the contract for the use of the more valuable patent rights of the defendant and for the other benefits of the illegal agreement. The illegality, therefore, taints the entire contract, and the provisions for annual payments cannot be separated from the rest of the agreement.

It follows that judgment should be given to plaintiff against the defendant. Findings of fact and conclusions of law passed upon. Settle decision and judgment.