Gerald Nolax, Ref.
TÉe plaintiff and the defendant are domestic corporations, having their principal places of business in Westchester County, New York, Plaintiff operates through its subsidiaries a number of stores, which engage in the wholesale distribution and retail sale of toys, stationery, books, sporting goods and related merchandise. In addition it has selected locations for and supplied equipment to a number of “ big top ” retail stores which have been sold to independent franchised dealers, who operate under plaintiff’s trade name, “ big top ” and purchase merchandise from the plaintiff in most cases pursuant to written franchise agreements. It is plaintiff’s claim that it has developed a plan, method, system and design for the operation of toy, stationery and variety stores of which its franchisees have the benefit, and that its franchisees also benefit from the goodwill and customer acceptance of its trade name “ big top ”, which has been developed by the plaintiff and its wholly owned subsidiaries over a period of many years. The franchise system gives to plaintiff’s franchiseés the benefit of plaintiff’s experience and expertise in the selection of locations for the operation of their stores, the selection and making available to them of the newest and latest items in the toy, stationery and sporting goods field, and, by providing ware *896 house facilities eliminates the need, on the part of the individual stores, to maintain large stocks of inventory, furnishing them with a ready source of supply for their merchandise needs.
Plaintiff’s method of operation is to select promising sites for “ big top ” stores, to lease and equip such stores, and to operate them, through its subsidiaries, or to sell them to independent franchised operators who will agree to purchase from plaintiff a specified percentage of their needs in the lines of merchandise stocked and sold by plaintiff.
Plaintiff holds no patents nor does it have a registered trademark. Neither does it manufacture any of the merchandise that it sells to its franchisees. The evidence does not disclose that it has any secret or confidential formulae or method of operation which would be protected by the enforcement of the contract which is the subject of this action.
Prior to the date of the contract, defendant ’s president became interested in acquiring a store such as those operated by plaintiff and its franchisees, and communicated with plaintiff. Plaintiff’s system of operation was explained, and some of its stores were shown to him, and he thereafter again communicated with plaintiff requesting that if a new location should be developed by plaintiff, he should be kept in mind as a possible purchaser thereof. In June or July, 1963, plaintiff communicated with him and informed him that a store at Ardsley, New York would be available, and that it was at a good location in an established trading area. . During a discussion concerning the store he was told that if it should not be sold to a franchised dealer, plain-jiff would itself operate it as a “ big top ” store. He was told also, on inquiry, that the store could not be purchased except under a “ big top” franchise, and that it would be necessary under the franchise to purchase 90% of his merchandise needs from the plaintiff, or plaintiff’s designees.
On August 27,1963, Howard Lippin and Fred Stern, the principal officers of the defendant, as “ purchaser ” entered into an agreement with top all varieties, plaintiff’s wholly owned subsidiary, as “ seller ”, for the acquisition of the lease of the store, located a 711 Saw Mill River Road in Ardsley, which agreement recited the fact that the purchaser desired to acquire the lease to said premises and the equipment to be installed therein upon the terms and conditions set forth in the agreement. Among other conditions were provisions for the purchase of the fixtures and equipment for $48,000, payable $4,000 down, and the balance in 75 monthly installments. It was further provided that at the closing the purchaser should execute a “ big top ” franchise agreement covering the store premises, a copy of which *897 had been exhibited to and initialed by the purchaser and its attorney.
The franchise agreement, which is the subject of this action, was executed on September 30, 1963, by and between the plaintiff and the defendant as assignee of the ‘ ‘ purchaser ’ ’ named in the agreement of August 27. It recited that the defendant desired to conduct at the store premises a franchised “ big top ” store, and to acquire a franchise therefor. The franchise was granted upon the terms and conditions stated in the agreement, among which are the following: “2. During the terms of this Agreement, the Operator covenants and agrees as follows:
“ (a) The Operator, shall, during each three-month period commencing with the date of this agreement, purchase at least ninety (90%) per cent of its merchandise requirements of toys, stationery, books and sporting goods from the Company at the standard prices charged by the Company to the other 1 big-top ’ Franchise Stores. During each such three-month period, the Operator shall purchase at least ninety (90%) of its other merchandise requirements from the Company or such affiliates, subsidiaries or other designees of the Company as the latter shall designate from time to time. In each case, the said ninety (90%) per cent shall be computedoon the basis of the dollar volume, at Operator’s cost, of its merchandise purchases during each three-month period. In the event of a breach of the foregoing, the Operator shall pay to the Company, upon demand, a sum equal to fifteen (15%) per cent of the cost price of all merchandise purchased from other sources in violation of this provision in addition to all other rights and remedies of the Company under this Agreement. * * *
“(e) The Operator shall continuously operate the said business at the above-described premises and the Company’s supervisory personnel shall have the right to enter upon the premises at any reasonable time for the purpose of examining the same, conferring with the Operator’s employees, inspecting and checking operation, merchandise, furnishings, supplies, and equipment and determining whether the business is being conducted in accordance with the aforesaid standards and with this agreement. * * *
“4. (a) If the Operator shall become in default beyond grace period under any mortgage, deed of trust, lease or sublease covering the described premises, or shall be adjudicated a bankrupt, or shall make an assignment for the benefit of creditors, or if a receiver shall be appointed to take charge of Operator’s affairs, or if Operator shall default in the performance of any covenant or agreement made herein, including but not limited *898 to, purchase of merchandise from the Company, its affiliates, etc., standards of operation, failure to obtain consent of the Company where required, payments of amounts due to the Company, and such defaults shall not be remedied to the Company’s satisfaction within ten (10) days after notice of such default,, the Company may, in addition to any other rights and remedies it may have, terminate this agreement and all rights of the Operator hereunder on five (5) days’ notice to the Operator. (Emphasis supplied.)
ss (Tb) In the event of such termination, the Company at its option, shall have the right to acquire from the Operator the leasehold on the said store premises without cost to the Company, as well as the right to purchase the fixtures, equipment and merchandise inventory in said premises. The purchase price of the fixtures and equipment shall be Operator’s original cost less depreciation at the rate of 33%% per year. The purchase price of the merchandise inventory shall be Operator’s original cost or market value, at wholesale, whichever is less. 0 e 0 (Emphasis supplied.)
6616. (b) The provision in Paragraph 2 (a) for payment to the Company of 15% of the Operator’s cost of merchandise purchased from other sources shall not apply to merchandise ordered "by the Operator from the Company, its affiliates, subsidiaries or other designees, which the latter have not been able to supply.”
At the same time the agreement of August 27 was carried out, the lease was assigned, and the necessary documents were executed and delivered in connection with the purchase of the fixtures and equipment. Defendant paid for the opening inventory, has also fully paid for the fixtures and equipment, and has operated and is still operating the store under a “ big top ” franchise.
Shortly after the opening of the store it became apparent that defendant was not purchasing 90% of its merchandise requirements of toys, stationery, books, and sporting goods from the plaintiff, as required by the franchise agreement. After an audit of defendant’s books, defendant was notified by plaintiff’s attorney by letter dated June 24, 1966 that it was in default under subdivision (a) of paragraph 2 of the franchise agreement, and demand was made for payment of the sum of $2,821.85, representing 15% of the cost of purchases made by defendant from suppEers other than the plaintiff or its designees, over and above the 10% permitted by the agreement during the period from the opening of the store until December 31,1965. On July 21, 1966, plaintiff’s attorney notified defendant that there wqs a further default representing 15% of the cost of purchases from, others in excess of the permitted 10%, during the period *899 from January 1, to June 30, 1966, in the additional amount of $2,352.45. Defendant was informed by this letter that top aMj varieties (plaintiff’s wholly owned subsidiary) elected to terminate defendant’s rights under the franchise agreement, and to acquire the leasehold, fixtures, equipment and merchandise inventory in the store, pursuant to subdivision (b) of paragraph 4 of the agreement.
Defendant, having refused to make the 15% payment, and to reassign the lease and deliver the equipment and inventory, this action was commenced. The complaint contains two causes of action. In the first cause of action plaintiff demands judgment for $5,174.30, the total of the 15% payments which allegedly became due by reason of defendant’s failure to comply with subdivision (a) of paragraph 2 of the agreement. In the second cause of action plaintiff demands judgment directing the reassignment of the lease and the transfer of the store premises to plaintiff, the transfer of the equipment, fixtures and merchandise inventory as required by subdivision (b) of paragraph 4 of the franchise agreement, directing compliance by with the franchise agreement pending delivery of the store premises, and the lease, and for incidental injunctive relief. Defendant’s answer consists of denials of the material allegations ©f the complaint, 14 defenses and 5 counterclaims, which will be later discussed.
The evidence establishes, and I find that the defendant has failed to comply with the provisions of the franchise agreement requiring the purchase of 90% of its merchandise requirements of toys, stationery, books and sporting goods from the plaintiff. The figures shown on plaintiff’s Exhibits 4 and 11, showing total purchases by defendant of the items of merchandise which are the subject of the dispute between the parties, from the beginning of defendant’s operations to December 31, 1885, and purchases by defendant from plaintiff during the same period, are more than substantiated by plaintiff’s Exhibit 25, concededly prepared by the defendant. The figures with respect to such purchases during the period from January 1, 1988 to June 30, 1966, upon which plaintiff relies, were based entirely on plaintiff’s Exhibit 7, also prepared by the defendant. The dispute between the parties is with respect to the cost of "the merchandise “ ordered by the defendant from plaintiff ©r its affiliates, subsidiaries or designees, which the latter have not been able to supply. ’ ’ With respect to such merchandise the provisión of subdivision (a) of paragraph 2 of the franchise agreement providing for the 15% payments, does not apply. It is quite possible that from time to time defendant ordered mereham *900 dise from plaintiff which plaintiff could not immediately furnish. However the evidence does not disclose with respect to defendant’s claim that it was unable to obtain from plaintiff merchandise which it obtained from others, whether defendant demanded immediate delivery, and whether such delivery was made by another supplier. Implicit in the franchise agreement is an obligation on plaintiff’s part to maintain a steady flow of merchandise to defendant, but plaintiff should have a reasonable opportunity to make delivery of merchandise which it might not, at any given time, have in its warehouse. The evidence does not disclose that on any of the occasions when defendant claims to have been unable to obtain merchandise from plaintiff, such opportunity was given, and in any event, I do not find the testimony with respect to plaintiff’s failure to supply defendant’s needs sufficiently reliable to make a finding that plaintiff was, with respect to any specific amount of merchandise, unable to supply defendant’s needs. I find therefore that plaintiff has established the allegations of its complaint with respect to the defendant’s default under subdivision (a) of paragraph 2 of the franchise agreement, and has performed the agreement on its part. Consequently, plaintiff is entitled to judgment, as demanded in the complaint, with respect to the first cause of action, unless the right to judgment is barred by the defenses pleaded, or any of them. None of the defenses pleaded requires extensive discussion except the fourth, sixth, seventh and the tenth. It is sufficient to say with respect to the others that they are not sustained by the evidence, and that the motion to dismiss the first, second, third, fifth, eighth, ninth, eleventh, twelfth, thirteenth and fourteenth defenses, is accordingly granted. For the same reason, the second, third, fourth and fifth counterclaims are dismissed.
In the fourth defense it is asserted that the provision of paragraph 2 of the agreement requiring defendant to pay 15% of the cost of merchandise purchased from other suppliers in excess of 10% of its needs, constitutes a forfeiture or penalty, and may not be considered as liquidated damages. I am unable to agree. It is well settled that if the parties to an agreement anticipate difficulty in ascertaining damages which may result from a breach, they may liquidate and settle by agreement the amount of damages to be paid, provided the amount agreed upon is not unreasonable or disproportionate to the probable loss that will result. (Cf. Mosler Safe Co. v. Maiden Lane Safe Deposit Co., 199 N. Y. 479, 485; De Leeuw v. Ziff-Davis Pub. Co., 277 App. Div. 1055.) Here the agreement between the parties was obviously suitable for such a stipulation, anticipating as it did, *901 numerous and detailed purchases, by the defendant of its merchandise needs, and the obvious difficulty in computing damages in case of a breach on an item by item basis. The stipulation for payment of 15% of the cost of purchases in violation of the agreement was neither unreasonable, nor disproportionate to the probable loss which could be anticipated at the time when the contract was made.
I do not find that the contract between the parties was induced by fraud as alleged in the tenth defense. However that may be, the contract, even if so induced was not void, but was voidable, at the election of the defendant. On discovery of the fraud defendant could have rescinded the agreement, or brought action for a rescission, or it could have affirmed the agreement and sued for damages resulting from the fraud. (Wood v. Dudley, 188 App. Div. 136, 140.) However, if defendant elected to rescind, it was required to do so promptly. Obviously, if the defendant was induced to enter into the franchise agreement by fraud in 1963, it was well aware of that fact long prior to the time when this action was commenced in 1966, and, nevertheless, continued to operate under the agreement. Under the circumstances the agreement was affirmed. Affirmance of the contract, of course, is not inconsistent with defendant’s counterclaim for damages. Defendant has not established, however, that the statements alleged to have been made were false when made, or that it was induced thereby to enter into the agreement. Defendant’s president, Lippin, had made his own investigation, was familiar with the plaintiff’s method of operation, both with respect to the stores which plaintiff conducted itself, and those which were operated by independent franchisees. He also was familiar with the use of the name “ big top ” in connection with plaintiff’s stores and those of its franchisees. Furthermore, there has been no competent proof of damages, the measure of which is the difference between the amount paid for the store, and franchise, and the value of what was received. (Reno v. Bull, 226 N. Y. 546.) The tenth defense and the first counterclaim are accordingly dismissed.
In the sixth defense, defendant asserts that the provisions of the franchise agreement, insofar as they preclude defendant from purchasing less than 90% of its requirements from anyone other than plaintiff, or its designees, are in violation of the antitrust laws of the United States, and of the State of New York. The seventh defense is similar in nature.
The franchise agreement, insofar as it does so provide, is, unquestionably an agreement in restraint of trade, and so operates not only within the State of New York, but also in restraint *902 of trade among the several States. It is claimed by defendant that its provisions violate the Donnelly Act (General Business Law, § 340), the Sherman Act (U. S. Code, tit, 15, §§ 1, 2) and the Clayton Act (IL S. Code, tit. 15, § 14).
Not every contract in restraint of trade or competition in business, however, is illegal, either at common law, or under State or Federal antitrust statutes. It is only the unreasonable restraints which are banned. (Cf. inter alia Stemmerman v. Kelly, 150 App. Div. 735; Barns v. Dairymen’s League Co-op. Assn., 220 App. Div. 624; Standard Oil Co. v. United States, 221 U. S. 1; Susser v. Carvel Corp., 206 F. Supp. 636, affd. 332 F. 2d 505.) With respect to a requirements contract or a contract requiring a franchisee to obtain his supplies exclusively from his franchisor, the question to be decided is whether the contract forecloses competition in a substantial share of the line of commerce involved (Denison Mattress Factory v. Spring-Air Co., 308 F. 2d 403, 410) or at least whether it probably would foreclose competition in a substantial share thereof. (Tampa Elec. Co. v. Nashville Coal Co., 365 U. S. 320.) In either case, the contract may be held to be unreasonable, and, if so, it may not be enforced. A restraint of trade may also be unreasonable because it falls within the class of restraints that are unreasonable per se. There are certain agreements, or practices, that are conclusively presumed to be unreasonable, and therefore illegal without elaborate inquiry into the harm that they have caused or the business excuse for their use. Among them are agreements involving tying arrangements, which may be defined as agreements under which the vendor will sell one product only if the purchaser agrees to buy another product as well, or at least agrees that he will not purchase that product from any other supplier. As a result of a successful tying agreement, competition is curtailed in two ways. The buyer is prevented from seeking alternative sources of supply for the tied product, and competing suppliers of the tied product are foreclosed from that part of the market which is subject to the tying arrangement. Tie-ins can rarely be justified because they serve hardly any purpose beyond the suspension of competition. For these reasons tie-ins have been held illegal under both the Clayton Act and the Sherman Act. (Cf. Standard Oil Co. v. United States, 337 U. S. 293, 305, 306 ; Times-Picayune v. United States, 345 U. S. 594; Northern Pacific Ry. Co. v. United States, 356 U. S. 1, 5; Advance Business Systems & Supply Co. v. SCM Corp., 415 F. 2d, 55, 60.) When the seller enjoys a monopolistic or dominant position in the market for the tying product, or if a substantial volume of commerce is restrained, a tying arrange *903 ment violates section 3 of the Clayton Act (XL EL Code, tit. 15, § 14). Whenever both conditions are met, a tying arrangement is banned by section 1 of the Sherman Act (XL EL Code, tit. 15, § 1). (Times-Picayune v. United States, supra.) These tests are met, however, when the seller has sufficient economic power in the relevant market for the tying product, to impose an appreciable restraint on free competition in the tied product. (Assuming that a not insubstantial amount of interstate commerce is affected.) (Northern Pacific Ry. Co. v. United States, supra.) Absent a showing of economic dominance, the crucial economic power may be inferred from the tying product’s desirability to consumers, or from uniqueness In its attributes (United States v. Loew’s, 371 U. S. 38) and the effect on interstate commerce need merely be said to be 66 not insubstantial ” (International Salt Co. v. United States, 332 U. S. 392, 396). This test is fulfilled if the dollar amount is not ie minimis, or paltry. (Fortner Enterprises v. United, States Steel Corp., 394 U. S., 495, 501, 502.)
The evidence establishes, and X find, that the franchise agreement is part of a tying arrangement, which, unless it may be justified, is fatal to the enforcement of the agreement. The tying product was the store, or possibly the store and the franchise, which could not have been obtained without the agreement requiring the purchase of 90% of the defendant’s merchandise needs from the plaintiff. The tied products are the toys, stationery, books and sporting goods, which defendant could have obtained from the manufacturers, or other suppliers, if it were not for the provisions of the franchise agreement requiring their purchase from the plaintiff. The relevant market for the tying product was not the real estate market in the field of plaintiff’s operations. What defendant wanted was a store location, in that field, approved by the plaintiff as a-desirable location for such an operation and the advantages which might be derived from plaintiff’s ready source of supply and co-operation. The relevant market for such a requirement was extremely limited, and obviously plaintiff occupied a dominant position in it. The dollar amount of the effect on commerce cannot be said to be de minimis. It was upwards of $145,000 if considered in relation to this agreement alone, and the same arrangement was involved in at least seven franchise agreements for other stores;
Unless it may be justified the franchise agreement violates section 1 of the Sherman Act. It does not violate section 3 of the Clayton Act, which is aimed at tying arrangements in which the tying product consists of goods, wares, merchandise, maeMn *904 ery, supplies or other commodities, and which does not prohibit a franchise agreement such as the agreement between the parties, if there is no tying arrangement unless the effect of the agreement may be substantially to lessen competition or to create a monopoly in any line of commerce. The evidence is not sufficient to sustain the conclusion that the franchise agreement might have such an effect within the meaning of the statute, without the tying arrangement.
Once the tying arrangement was established, the burden fell on the plaintiff to justify the arrangement as reasonably necessary to protect its goodwill and its property rights in its trade name. (Cf. Susser v. Carvel Corp., 332 F. 2d 505.) The evidence adduced, however, does not establish that the tying arrangement was entered into for that purpose. The usual justification for tie-ins is that they are necessary for quality control of the tied product. (Cf. Susser v. Carvel Corp., supra, 206 F. Supp. 636, 645, affd. 332 F. 2d 505; United States v. Jerrold Electronics Corp., 187 F. Supp. 545, 559, affd. 365 U. S. 567; Siegel v. Chicken Delight, 311 F. Supp. 847.) In the instant case, however, for all that appears to the contrary, the defendant could have bought other products, similar to those supplied by plaintiff, whether of the same quality or not, to the extent of 10% of its needs, and to any greater extent, if it was willing to pay the 15% of the cost of such products, over and above 10% of its needs. This cause of action is asserted, not because defendant has purchased supplies of inferior quality from other suppliers, but because defendant has refused to pay the stipulated percentage of the cost of such supplies. The only situation, indeed, in which the protection of goodwill may necessitate the use of tying clauses, is where specifications for substitute products would be so detailed that they could not practically be supplied. (Cf. Standard Oil Co. v. United States, supra, pp. 305, 306.) In the instant case there would obviously be no difficulty in specifying substitutes for the products which plaintiff was supplying, if plaintiff itself could not supply them. Indeed plaintiff could have specified the very products which it was delivering to the defendant which could be readily purchased frorh the manufacturers, or from other suppliers. Plaintiff did not submit any evidence of justification of the tying arrangement, but relied on the contention that this court cannot entertain antitrust affirmative defenses or counterclaims. With respect to counterclaims based on Federal antitrust statutes, the plaintiff has correctly stated the law, and defendant does not contend to the contrary. Jurisdiction of claims for affirmative relief based on violations of such statutes is exclusively possessed by the Federal courts. *905 (Cf. Barns v. Dairymen’s League Co-op. Assn., 220 App Div. 624, 635 and cases cited; Mayer Bros. Poultry Farms v. Meltzer, 274 App. Div. 169, 178.)
It is equally well settled, however, that a defense that a cause of action does not lie because it is based on a violation of a Federal statute, will be entertained by the courts of this State (cf. Remington Rand v. International Business Mach. Corp., 167 Misc. 108, 115-116) and that State courts have jurisdiction in an action on a contract to consider the merits of a claim which alleges that the agreement before the court violates the Federal antitrust acts. (City Trade & Ind. v. New Century Jute Mills Co., 25 N Y 2d 49; General Aniline & Film Corp. v. Bayer Co., 305 N. Y. 479, 484, 485.)
It is the settled law of this State that a party to an illegal contract cannot ask a court of law to help him carry out his illegal object, nor can a person plead or prove, in any court a case in which as a basis for his claim, he must show his illegal purpose (Stone v. Freeman, 298 N. Y. 268, 271).
Kelly v. Kosuga (358 U. S. 516) and similar cases relied on by plaintiff are readily distinguishable. They stand for the rule that a party to a contract may not avoid payment for goods sold and delivered to him on the ground that the contract of sale violates the Federal antitrust statutes by provisions thereof separable from the promise to pay. In such cases the plaintiff is not required, in order to prove his case to disclose the illegality of the contract pursuant to which the sale was made. Here the plaintiff is asking the court to enforce the very provision of the franchise agreement which operates as an illegal restraint of trade.
The franchise agreement, insofar as it requires the defendant to purchase 90% of its merchandise needs of books, toys, stationery and sporting goods from the plaintiff, and requires the defendant to pay 15% of the cost of purchases in excess of 10% thereof, from other suppliers, must be held to be illegal, as in violation of section 1 of the Sherman Act, in the absence of proof of justification therefor. Absent such proof, it must also be held to violate the Donnelly Act (General Business Law, § 340). (Cf. Remington Rand v. International Business Mach. Corp., 167 Misc. 108, 116; Matter of Aimcee Wholesale Corp., 21 N Y 2d 621, 626.) The first cause of action should, accordingly be dismissed, but without prejudice to proof of justification in any other pending or future action in which an issue with respect to the validity of the franchise agreement is presented.
For the reasons heretofore stated the second cause of action must also be dismissed. Dismissal is also required for an addi *906 tional reason. This canse of action is based on subdivisions (a) and (b) of paragraph 4 of the franchise agreement, which provide that on default in the performance of any covenant or agreement included therein the plaintiff may ‘1 terminate this agreement and all rights of the operator hereunder ”, and that in the event of such termination the plaintiff shall have the right to acquire from the defendant the leasehold on the store premises and to purchase the fixtures, equipment and merchandise inventory. It may be assumed that the top all varietiesí inc. had authority from the plaintiff to' act in its behalf in exercising plaintiff’s option under subdivision (b) of paragraph 4. However, by the action taken, plaintiff did not terminate the agreement and the rights of the defendant thereunder. It elected merely to terminate defendant’s rights under the agreement, evidently intending to hold defendant to its obligations under the agreement, while denying it any rights thereunder. It may be that the effect of plaintiff’s action was to terminate the agreement, but plaintiff took the position, on trial, that the agreement had not been terminated. The action taken, if that was its effect, was not that contemplated by the agreement as a condition precedent to plaintiff’s right to acquire the leasehold, and the fixtures, equipment and inventory. Consequently, defendant is entitled to judgment, dismissing the entire complaint.
Judgment is accordingly directed to be entered by the Clerk of this court, in favor of the defendant, dismissing the complaint, without prejudice however to proof of justification, of the franchise agreement, by the plaintiff, in any other pending or in any future action in which an issue is presented as to its validity, on the ground that it violates the State or Federal antitrust statutes, and in favor of the plaintiff, dismissing the counterclaims and defenses interposed in defendant’s answer, with the exception of the sixth and seventh defenses, as to which plaintiff’s motion is denied. Under all of the circumstances it would not be equitable to allow costs to either party as against the other, and the judgment to be entered shall so provide, except that each of the parties shall pay one half of the compensation of the Beferee as provided by the stipulation of the parties dated May 28, 1970, and the order of the court in accordance therewith. If either party shall be so advised the judgment may be settled as to form, on motion as provided in subdivision (c) of CPLB 5016,