## Richmond

AZALEA DRIVE-IN THEATRE, INCORPORATED ET AL.
v. EDWARD A. SARGOY, ET AL., ETC.

April 28, 1975.

Record No. 740472.

Present, All the Justices.

*Stanley E. Sacks (Louis H. Cohn; Sacks, Sacks & Tavss*, on brief), for plaintiffs in error.

*Lewis T. Booker (Benjamin C. Ackerly; Hunton, Williams, Gay & Gibson*, on brief), for defendants in error.

I'Anson, C.J., delivered the opinion of the court.

Plaintiff, Sargoy, Stein & Hanft (Sargoy), instituted this action against defendants, Azalea Drive-In Theatre, Incorporated, and Twin Drive-In Theatre, Inc. (defendants), to obtain a judgment on a promissory note dated February 12, 1971, in the amount of $70,000, together with interest and a reasonable attorney's fee. Defendants filed a responsive pleading and numerous affirmative defenses, one of which alleged that the note was void because it was procured in violation of the

Sherman Anti-Trust Act and the Robinson-Patman Act. Defendants also filed a counterclaim for treble damages based upon alleged violations of these two antitrust acts.

Sargoy moved to strike defendants' affirmative defense based upon the federal antitrust laws because such defense was not available in this State court action. Sargoy also filed a plea in abatement to defendants' counterclaim asserting that federal district courts have exclusive jurisdiction to entertain federal antitrust actions. The motion to strike and the plea in abatement were sustained by the trial court.

Defendants' request for a jury trial was denied by the trial court because the note sued on provided that the right to a jury trial was waived by defendants in any litigation resulting from a default on the note.

After hearing evidence, the trial judge stated in an opinion letter that the legal issues presented turned on issues of fact and, as the trier of fact, he was resolving the issues in favor of Sargoy. Judgment was accordingly entered for Sargoy for the full amount of the note, together with interest and attorneys' fees.

The evidence shows that Earnest H. Price was the sole stockholder and operator of the Azalea and Twin Drive-In Theatres, located in Norfolk, Virginia. Films for the two drive-ins were rented from nine major distributors, who represented at least 75% of the total motion picture distribution companies in the country. The standard rental fee was 40% of the paid admissions less sales tax. To ensure that the total admissions were accurately reported by the drive-ins (commonly known as exhibitors in the industry), the rental contracts contained a clause permitting the distributors or their agents to audit the exhibitors' records.

In November 1970 Sargoy, a New York law firm representing the nine distributors, notified defendants that it was sending Philip Kornfeld, an auditor, to Norfolk to audit the records of the two theatres. After an audit of the accounts covering a five-year period, Kornfeld came to the conclusion that defendants had underreported admissions in the sum of $220,000.

Kornfeld arrived at this figure by comparing concession receipts to admissions on those nights when defendants knew

admissions were being independently counted. The concession receipts were approximately 48.5% of the admission receipts when defendants knew they were being checked. However, on nights when "blind checks" were conducted, the percentage of concession receipts to admissions varied from 55% to 75%, indicating that not all of the admissions had been reported.

Another indication that there was underreporting was that the national average of persons per car entering a drive-in theatre was 2.2. Defendants' records did not reflect this national average.

At a meeting held on February 12, 1971, Kornfeld advised both Price and his accountant, Carl J. Katz, what his audit showed and told them that the unreported admissions represented a claim against defendants in the amount of $88,000.

Price and Katz testified that they questioned the accuracy of Kornfeld's figures, but they said Kornfeld told them that, if defendants did not agree to a settlement that day, defendants would not receive any more films. Kornfeld repeatedly denied making this threat.

Price and Katz then held a private conference and decided that it would be best for Price to accept some form of agreement to avoid having his film supply cut off, which would put the theatres out of business. A compromise figure of $70,000 was finally agreed upon with Kornfeld. At this time Price, as president of the two corporations, signed a note payable to Sargoy in the agreed amount. The note was to be paid over a three-year period and the first payment was due June 1, 1971. Two $7,500 checks were to be held in escrow for the first payments on the note.

Kornfeld then asked Price to sign a settlement agreement which purported to release any further claims against defendants arising out of the audit period ending on December 31, 1970. Price stated that he wanted his attorney to review the agreement before he signed it. Kornfeld agreed to this and asked Price to mail the agreement to him after his attorney had read it and Price had signed it for the corporations.

The settlement agreement provides, in pertinent part:

"In order to settle and resolve the questions and controversies between the Exhibitor and each respectively of said Distributors involving or in any way connected with each

and any said Released Theatre(s), and to effect a mutual exchange of releases as to Released Theatre(s) between the Exhibitor and each said respective Distributor, in the content and form of the accompanying Schedule A (which is the typical form of mutual exchange of release contemplated by this agreement), it is mutually agreed as follows:

. . . .

"4. Upon confirmation of acceptance it is further mutually agreed that the Exhibitor shall be deemed to have entered into and effected a mutual exchange of release with each separately of the above named Distributors, in the form of the accompanying Schedule A which is made a part hereof for such purposes . . . .

. . . .

"8. IN WITNESS WHEREOF, this offer of settlement has herewith been executed by the Exhibitor, which upon confirmation by Sargoy & Stein of acceptance hereof as above provided, shall be deemed to be the settlement agreement of the respective parties hereto, with the effective release date hereof for the purpose of the releases provided herein being the day preceding the 31st day of December 1971." (Date handwritten.)

Kornfeld later discovered that he had mistakenly written the effective release year as 1971 in the agreement instead of 1970. He said that he called Katz on the telephone and informed him of the mistake and that Katz stated that he would see to it that the date was changed. Katz denied receiving any such call from Kornfeld.

Kornfeld delivered the note and two $7,500 checks to David Fallick, his superior, in New York. Fallick testified that one of the dates on the checks had been changed and suggested that Kornfeld get a replacement from Price. On March 3, 1971, Fallick received, and acknowledged receipt of, the settlement agreement signed by Price, as president of the corporations, and the revised check.

Upon examination of the settlement agreement, Kornfeld noticed that the date of the effective release on the agreement had not been changed from 1971 to 1970, as he had requested Katz to do. Kornfeld then changed the date himself.

After receiving the settlement agreement, Fallick sent letters to all nine distributors asking them if they would accept a certain percentage of the $70,000 in settlement for their claims. Written acceptances were received from seven distributors and oral acceptances from the remaining two.

Burton H. Hanft, attorney for Sargoy, testified that he signed the settlement agreement on behalf of the distributors. He stated that plaintiffs had been the attorneys and agents for the nine distributors for the past thirty years; that all the distributors had given him the authority to accept the settlement agreement in this particular case; and that he had communicated this authority to defendants.

On April 2, 1971, Fallick wrote a letter to Price informing him that the distributors had accepted the agreement. He enclosed a separate mutual release from each distributor for Price to sign and return. On May 3, 1971, Fallick again wrote Price asking him to sign and return the releases. He received no response from Price.

The next word that Fallick received on the matter was a phone call and a letter from defendants' attorney three days before the first installment on the note was due, stating that defendants did not intend to go through with the settlement and that a "stop payment" order had been placed on the two checks.

■ Defendants' first contention is that the trial court erred in striking its affirmative defense based upon violations of the Sherman Anti-Trust Act and the Robinson-Patman Act. They argue that the note was unenforceable because it was illegally procured under threat of refusing to supply them with films in violation of the federal antitrust acts. We do not agree.

This issue has been resolved against defendants by the United States Supreme Court in the cases of *Bruce's Juices, Inc.* v. *American Can Co.*, 330 U.S. 743 (1947), and *Kelly* v. *Kosuga*, 358 U.S. 516 (1959). In *Bruce's Juices* the vendor of canned goods brought suit against the buyer, Bruce's Juices, Inc., to recover on several renewal notes upon which the buyer had defaulted in payment. The buyer alleged that the notes were illegal and void because the vendor discriminated against it in violation of the Robinson-Patman Act.

The sole issue to be decided by the Court was "whether renewal notes representing the purchase price of goods sold and

delivered are uncollectible if it is found that the vendor violated the Robinson-Patman Act . . . ." *Bruce's Juices, supra,* 330 U.S. at 744. In affirming the decision of the Supreme Court of Florida in favor of the plaintiff, American Can Co., the Court stated:

"If, in order to prove his own case, a plaintiff proves his violation of law, then no court will aid the plaintiff to recover. Here, however, what the plaintiff must show is the notes which import consideration. If consideration is denied, he can prove that cans were sold and delivered at a stated price. That is no violation of law. It is only when the court goes outside of the dealings between plaintiff and defendant and it is proved that the same kind of cans were sold to others at different prices within a relevant period of time, amounting to a discrimination . . . that the basis of the defense asserted here appears." *Id.* at 756. (Footnote omitted.)

The Court further stated that, if defendant could actually prove its charge, it could sue the plaintiff for treble damages under the Robinson-Patman Act. However, any such claim, whether in the form of a motion for judgment or a counterclaim, is within the exclusive jurisdiction of the federal district courts and cannot be entertained by a state court.

The Supreme Court stated the rationale behind this rule in *Kelly* v. *Kosuga, supra,* in which it affirmed a district court in striking a defense, based upon the Sherman Anti-Trust Act, to a suit for the collection of the purchase price for fifty train carloads of onions. There the Court stated:

"As a defense to an action based on contract, the plea of illegality based on violation of the Sherman Act has not met with much favor in this Court . . . . In D. R. Wilder Mfg. Co. v. Corn Products Refining Co., 236 U.S. 165 . . . . [t]he Court observed that the Sherman Act's express remedies could not be added to judicially by including the avoidance of private contracts as a sanction . . . . Obviously, state law governs in general the rights and duties of sellers and purchasers of goods, and, while the effect of illegality under a federal statute is a matter of federal law, . . . still the federal courts should not be quick to create a policy of nonenforcement of contracts

beyond that which is clearly the requirement of the Sherman Act. [Citations omitted.]

. . . .

"Accordingly, while the nondelivery agreement between the parties could not be enforced by a court, if its unlawful character under the Sherman Act be assumed, it can hardly be said to enforce a violation of the Act to give legal effect to a completed sale of onions at a fair price . . . . [W]here, as here, a lawful sale for a fair consideration constitutes an intelligible economic transaction in itself, we do not think it inappropriate or violative of the intent of the parties to give it effect even though it furnished the occasion for a restrictive agreement of the sort here in question." 358 U.S. at 518-19, 521. (Footnote omitted.)

See also *Medusa Corporation* v. *Gordon*, 496 F.2d 249 (6th Cir. 1974); *Response of Carolina* v. *Leasco Response, Incorporated*, 498 F.2d 314 (5th Cir. 1974); *Appalachian Power Company* v. *Region Properties, Inc.*, 364 F.Supp. 1273, n. 11 at 1278 (W.D.Va. 1973); *N.Y. Stock Exchange, Inc.* v. *Goodbody & Co.*, 42 A.D.2d 556, 345 N.Y.S.2d 58 (1973); *Polycast Technology Corporation* v. *Rohm & Haas Company*, 305 A.2d 323 (Del. 1973). *Cf. Big Top Stores, Inc.* v. *Ardsley Toy Shoppe, Ltd.*, 315 N.Y.S.2d 897 (N.Y.Sup.Ct. 1970).

In the instant case, the amount of the note represented a compromise of the amount found to be due on account of unreported admission receipts. For Sargoy to make out a prima facie case on the promissory note, the genuineness of the signatures being admitted by defendants, it needed only to produce the instrument. This entitled Sargoy to recover in the absence of any further evidence or defense established by defendants. Code § 8.3-307(2); *Cox* v. *Parsons*, 165 Va. 575, 577, 183 S.E. 440, 441 (1936); *Holdsworth* v. *Anderson Drug Co.*, 118 Va. 359, 361, 87 S.E. 565, 566 (1916). The alleged federal antitrust violation was collateral to the main issue in plaintiff's motion for judgment, and it was not a viable defense in this action. Here, the enforcement of the promissory note in no way furthers the alleged illegal activity of Sargoy and the distributors.

Defendants contend that the trial court erred in denying them a jury trial because the note was illegally procured under a threat to cut off their film supply in violation of the federal antitrust laws, and that the jury waiver provision in the note suffers the same infirmity as the note itself.

The validity of a provision in an instrument waiving a jury

in a great number of cases. However, the jury waiver provision has been held to be invalid when the instrument in which it is contained is void. 47 Am.Jur.2d, "Jury," § 86 at 700 (1969). *See also* Annot., "Contractual Waiver of Jury Trial," 73 A.L.R.2d 1332, 1336.

Since the provision in the note waived a jury trial, and we have held that in the present case the alleged violation of the federal antitrust laws is not a viable affirmative defense to this action on the note, we hold that the trial court did not err in denying the defendants' motion for a trial by jury.

■ Defendants next contend that their offer of settlement was contingent upon the nine distributors executing separate releases with the defendants, which was never done. Thus they argue that their offer of settlement was never accepted. We do not agree.

Paragraph 4 of the settlement agreement is clear and unambiguous. It provided that upon acceptance of the settlement agreement by the distributors defendants "shall be deemed to have entered into an effective and mutual exchange of release with each" of the distributors.

The evidence shows that the settlement agreement was signed by defendants and received by Sargoy on March 3, 1971. It was accepted by the distributors pursuant to Fallick's letter of April 2, 1971. Consequently, the settlement agreement, in accordance with its terms, became binding on all the parties without the execution of the releases. Moreover, defendants cannot now complain that they did not receive releases from the distributors because they never returned them for the signatures of the distributors or their authorized agents.

Defendants assigned other errors which were not urged in oral argument before us. However, we have considered the alleged errors and find no merit in any of them. Most of those alleged errors were based on factual issues and, since there is evidence to support the findings of the trial court, a discussion of them would serve no useful purpose. *See White and P & W Oil Co.* v. *Perkins,* 213 Va. 129, 134, 189 S.E.2d 315, 319 (1972); *Spence* v. *Spence,* 212 Va. 431, 435, 184 S.E.2d 763, 765-66 (1971).

For the reasons stated, the judgment of the court below is

*Affirmed.*