**OGDEN DEVELOPMENT CORPORA-TION and the Dwight Building Company, Plaintiffs-Appellants,**

v.

**FEDERAL INSURANCE COMPANY, Defendant-Appellee.**

No. 171, Docket 74–1604.

United States Court of Appeals, Second Circuit.

Argued Oct. 17, 1974.

Decided Dec. 9, 1974.

William W. Owens, New York City (Rogers & Wells, New York City), for plaintiffs-appellants.

Cecil F. Holland, Jr., New York City, Hart & Hume, New York City, for defendant-appellee.

Before DANAHER,* FEINBERG and MULLIGAN, Circuit Judges.

DANAHER, Senior Circuit Judge:

The appellants [1] (herein Ogden/Dwight, a joint venture), sued on an obligation in which Charles Pankow, Inc. (herein Pankow) [2] a competing contracting company, was principal, and appellee,

---

* Senior Circuit Judge for the District of Columbia Circuit, sitting by designation pursuant to 28 U.S.C. § 294(d) (1970).

Federal Insurance Company (herein Federal) was surety. Ogden/Dwight relying upon Rule 56(c), had sought summary judgment, interlocutory in character, on the issue of liability, or, in the alternative, pointing to Rule 56(d), had moved for an order specifying facts appearing to be without substantial controversy. Federal cross-moved for summary judgment dismissing the complaint. District Judge Tenney concluded that the bond in suit had prescribed a penalty rather than a legally enforceable provision for liquidated damages. Accordingly he ruled as a matter of law that a complete legal defense had been presented, and so Ogden/Dwight's motion was denied in its entirety. Thereupon Federal's motion was granted and the complaint was dismissed.

We affirm.

The University of Vermont[3] in 1971 inaugurated a contest among selected contracting firms who were invited to submit proposals for the design and construction of a residential and educational complex on University property in Vermont. Over the period pertinent to our consideration Mr. Melvin A. Dyson was Chief Financial Officer of the University. His letter in the front of a pre-qualification "Brochure" had notified the prospective contestants that the University ultimately would select a single proposal according to quality and design, with the project cost fixed in the neighborhood of $5,750,000. A "Request" for proposals would be issued on June 21, 1971, only to those who had qualified in all respects. Each Design/Build Team, so-called, was informed further that the posting of an acceptable Proposal Performance Bond was a prerequisite to establishing eligibility for further consideration.

As of June 18, 1971, Pankow as Principal and Federal as Surety had entered into and forwarded to the University the required Proposal Performance Bond in the penal sum of $20,000 in favor of the University of Vermont as promisee. The obligation submitted by Pankow was expressly subject to the following condition:

> Now, Therefore, if the said Principal shall notify the University in writing before July 2, 1971, that they [sic] cannot prepare an adequate proposal or shall submit on or before 2 o'clock p. m., August 23, 1971, a complete Design/Build Proposal, then this obligation shall be void; otherwise the bond will be forfeited unto the University of Vermont as liquidated damages.[4]

Pankow was later to be informed by Mr. Dyson's letter dated July 7, 1971, that the Pankow firm and two other qualified contestants, Ogden/Dwight and The Carlson Corporation, had been chosen to proceed, and that the University would look forward to receipt of their Design/Build Proposals not later than September 6, 1971 (a date later extended to September 13, 1971).[5]

---

1. Ogden Development Corporation, a Delaware corporation, and the Dwight Building Company, a Connecticut corporation.

2. Pankow is a California corporation, and Federal is a New Jersey corporation with its principal place of business in New York City.

3. Not a party to this action.

4. The University had specified that if a Design/Build Team notified the University in writing before July 2, 1971, that it could not prepare an adequate proposal, its Proposal Performance Bond or check would be returned. Six of the nine Design/Build Teams which had met prequalification requirements and accordingly had received the University's "Request" document prescribing guidance details and specifications decided after consideration to withdraw from the competition, and their Proposal Performance Bonds were returned to them.

5. The University additionally had assured the return of a Proposal Performance Bond if a complete Design/Build Proposal were submitted to the University by September 13, 1971. However, the Request continued: "If for any reason a Design/Build Team fails to submit a [timely] proposal . . . the bond or check will be forfeited to the University as liquidated damages."
The University further explained:
It is not the intention of the University to profit from such forfeiture; the money will be used to cover any expenses incurred by the University because of the failure of any Design/Build Team to submit a complete Design/Build Proposal and the remainder

All three Design/Build Teams submitted their respective proposals on the due date. Pankow had tendered a cost overrun of $392,000. Where the University had contemplated five housing clusters, Pankow had proposed to design and to construct only four. Pankow planned an average of 150 students to each cluster which, according to Mr. Dyson's affidavit, would have permitted the housing of too few students at the Center. Yet other variances were the subject of controversy, apparently unresolved by exchanges of correspondence and telegraphic communications. Mr. Dyson's affidavit of record further attested his meeting with the Chairman of the Evaluation Committee, the University's counsel and three professional architects in whose opinion the Pankow proposal as amended could not be evaluated and was deemed not in compliance with the specifications in the Request. Without our enumeration of yet other aspects of dissatisfaction,[6] Mr. Dyson as of September 23, 1971, wrote Pankow demanding payment under the bond. Receiving no response, then or thereafter, the University, acting by its board of trustees, on October 7, 1972, assigned to Odgen/Dwight any claim[7] the University might have against Pankow and Federal. This action was thereafter instituted by complaint dated December 6, 1972.

## I.

■ Against the background of the foregoing facts, we must discern applica-

ble law in this diversity case[8] under New York choice of law rules, pursuant to which New York courts would probably look to Vermont law. The briefs of the parties in this court ignored Vermont law entirely. In our own analysis, and since we have found no contrary authority, we will assume that Vermont law does not differ from New York law on the issues before us. Accordingly we have here relied almost completely on general authorities and on decisions construing New York law.[9]

Turning now to the contract in suit, *supra*, there was to be no liability if before July 2, 1971, the University should receive written notice from Pankow that Pankow could not prepare an adequate proposal. However, we also may perceive that Pankow agreed that its bond (with Federal as surety) would be forfeited to the University as "liquidated damages" unless performance was accomplished by the dates the University prescribed.

It seems beyond peradventure that the University desired specifically to know by July 2, 1971, just exactly what Design/Build Teams were to continue in the competition. Additionally, the University had prescribed a time schedule as it sought assurance of being able to evaluate completed Design/Build Proposals from each of the respective contestants.

■■ The performance sought clearly was intended for the benefit of the Uni-

---

distributed among those Design/Build Teams who have submitted unsuccessful proposals.

In reference to the foregoing, Mr. Dyson in his affidavit in support of the Ogden/Dwight motion asserted:

It should have been obvious to each prospective contestant that the University could suffer only slight damage if a participant submitted an incomplete proposal. (See note 7, *infra*.)

The contract was ultimately awarded to The Carlson Corporation.

6. Pankow pleaded various defenses controverting the University's claims of justification for its declaration of forfeiture. In the view we take of this case we need not consider the factual conflict. Neither did Judge Tenney.

7. See note 5, *supra*. There is no evidence of record that the University sought recovery of any expenses on its own account.

8. There is no apparent reason why this action could not have been brought in the state courts of Vermont or New York or in the Vermont federal court. Apparently the Southern District of New York was chosen primarily as a matter of convenience for plaintiffs' lawyers.

9. If our views of governing law shall appear mistaken when eventually assessed by the state courts, either of New York or of Vermont, appropriate correction will follow. Of course, any such possible clarification will not benefit the parties now before us, but as noted, they had chosen not to utilize a more authoritative forum for pronouncement of state law.

versity, and the promise of Pankow and Federal ran directly to the University alone.[10] The University had disavowed in advance any intention to profit from a possible forfeiture, indeed the University envisioned only slight damage if a participant should submit an incomplete proposal.[11]

■ Assuming a forfeiture, had the University itself instituted action on that bond, Federal would have been entitled to judgment unless the University could have shown that the penal sum of $20,000 represented a reasonable forecast of just compensation because of Pankow's alleged failure to submit a complete proposal. Under such circumstances, the agreement before us is not enforceable as a contract.[12] What we have here is an agreement which constitutes a "penalty."

Perhaps even though the Court had before it a government contract, we may profitably consider the general principles discussed in Priebe & Sons v. United States, 332 U.S. 407, 68 S.Ct. 123, 92 L.Ed. 32 (1947). There Mr. Justice Douglas identified the question of whether a provision for "liquidated damages" should be denied enforcement on the ground that it constitutes a "penalty." There had been a failure of promised performance by a date certain whereupon "liquidated damages" had been sought.

The opinion speaks of delays by contractors creating no damaging interference with continuance of the procurement program, and then goes on to say:

Under these circumstances this provision for "liquidated damages" could not possibly be a reasonable forecast of just compensation for the damage caused by a breach of contract. It might, as respondent suggests, have an *in terrorem* effect of encouraging prompt preparation for delivery. But the argument is a tacit admission that the provision was included not to make a fair estimate of damages to be suffered *but to serve only as an added spur to performance.* It is well-settled contract law that courts do not give their imprimatur to such arrangements. See Kothe v. R. C. Taylor Trust [280 U.S. 224, 226, 50 S.Ct. 142, 74 L.Ed. 382]; Restatement, Contracts § 339. All provisions for damages. are, of course, deterrents of default. But an exaction of punishment for a breach which could produce no possible damage has long been deemed oppressive and unjust. 332 U.S. at 413, 68

---

10. On the face of the instrument there was no promise to render performance to any third person.

In this circumstance we do not agree with the contention of Ogden/Dwight that the bond together with the "Request," *supra* note 5, constituted a single contract, to which Ogden/Dwight and Pankow were parties. We recognize that writings which form part of the same transaction and are designed to effectuate a common purpose may in some situations be read together even though they are not all between the same *parties, see, e. g.,* Kurz v. United States, 156 F.Supp. 99, 103–104 (S.D.N.Y.1957), *aff'd,* 254 F.2d 811 (2 CA 1958), and authorities there cited.

Here, however, we cannot find that the writings sought to be read as a single contract were sufficiently closely related to come within the rule. In any event, as we point out in the text, *infra,* Ogden/Dwight suffered no loss occasioned by Pankow's conduct. When Ogden/Dwight entered the competition, it plainly accepted the risk of possible loss of its own expenses in the preparation of its proposal if it should fail to submit a better plan than that of the successful competitor, The Carlson Corporation. Thus, even if Ogden/Dwight could have sued directly on the alleged "contract," it still would have been seeking to enforce a penalty, a course which must fail for the reasons discussed in our text, *infra.*

11. *Supra,* note 5.

12. Restatement of Contracts, Section 339(1) (1932)

(1) An agreement, made in advance of breach, fixing the damages therefor, is not enforceable as a contract and does not affect the damages recoverable for the breach, unless

(a) the amount so fixed is a reasonable forecast of just compensation for the harm that is caused by the breach, and

(b) the harm that is caused by the breach is one that is incapable or very difficult of accurate estimation.

S.Ct. at 126. (Citations omitted.) (Emphasis added.) [13]

It fairly may be observed that there is no suggestion that Ogden/Dwight suffered in any way or changed its position on any account because of anything Pankow did or failed to do. The same is true of the University itself.[14] Thus the specification of the penal sum of $20,000 seems so disproportionate to any damage reasonably to have been anticipated, that the provision under consideration must be viewed as one for an unenforceable penalty. We do not here see a situation where the parties really meant to treat that sum as the equivalent of "estimated and ascertained" damages.[15]

Judge Tenney so interpreted the language of the instrument before him and correctly applied the law.[16]

## II.

It may well seem that we are not called upon to go further but in view of the earnestness with which Ogden/Dwight has advanced its claim, we will consider its status. Judge Anderson points out in Hylte Bruks Aktiebolag v. Babcock & Wilcox Co., 399 F.2d 289, 292 (2 CA 1968), quoting from 10 N.Y.Jur., Contracts, § 239, at 162:

> "It is essential not merely that the contract shall operate for the benefit of the third person but that it shall have been so intended." [17]

Restatement, Contracts, Section 133, delineates third-party beneficiaries as of three classes, (1) the donee beneficiary and (2) the creditor beneficiary but then in (3) defines as an incidental beneficiary a party which does not come within classifications (1) or (2). Illustration 9, applicable here, may be transposed to read:

> If B, Pankow, promises to pay A, the University, in order that the University may be provided with money to pay C, D, and E, the latter "are at most incidental beneficiaries." [18]

---

**13.** *And see* the opinion of Mr. Justice Frankfurter, who, dissenting because a Government contract was involved, nevertheless observed: "Accordingly, if this contract were an ordinary commercial contract subject to the ordinary rules of the law of contract, I should have to find against the Government." *Id.* at 419, 68 S.Ct. at 129.

Incidentally, on the brief for the successful petitioner was Samuel Williston.

**14.** *See* the excerpt from Mr. Dyson's affidavit, *supra* note 5.

**15.** Kothe v. R. C. Taylor Trust, 280 U.S. 224, 226, 50 S.Ct. 142, 143, 74 L.Ed. 382 (1930) where the Court made the point thus:

[A]greements to pay fixed sums plainly without reasonable relation to any probable damage which may follow a breach will not be enforced. This circumstance tends to negative any notion that the parties really meant to provide a measure of compensation—"to treat the sum named as estimated and ascertained damages."

What really appears from the instant record is the University's purpose to secure "an added spur to performance," Priebe & Sons v. United States, *supra*, 332 U.S. at 413, 68 S.Ct. 123, 92 L.Ed. 32.

**16.** *See* City of Rye v. Public Serv. Mut. Ins. Co., 42 App.Div.2d 749, 346 N.Y.S.2d 163, 165–166 (2d Dep't 1973); Big Top Stores, Inc. v. Ardsley Toy Shoppe, Ltd., 64 Misc.2d 894,

315 N.Y.S.2d 897, 904 (Sup.Ct.1970), aff'd, 36 A.D.2d 582, 318 N.Y.S.2d 924 (2d Dep't 1971); Restatement of Contracts § 339, *supra* note 12; *cf.* J. Weinstein & Sons, Inc. v. City of New York, 264 App.Div. 398, 35 N.Y.S.2d 530, 532 (1st Dep't), aff'd, 289 N.Y. 741, 46 N.E.2d 351 (1942).

**17.** Judge Anderson observed, *id.*, 399 F.2d at 293, n.6, that Professor Corbin is more liberal than the New York courts. *See, e. g.*, Judge Friendly in Rey v. Penn Shipping Co., Inc., 277 F.2d 905, 906–907 (2 CA 1960) citing with approval Pennsylvania Steel Co. v. New York City Railway Co., 198 F. 721, 749 (2 CA 1912) where the court said "It must appear that the parties intend to recognize [the third person] as the primary party in interest and as privy to the promise." *Compare* Associated Flour Haulers & Warehousemen, Inc. v. Hoffman, 282 N.Y. 173, 180, 26 N.E.2d 7, 9–10 (1940); DeGioia v. United States Lines Company, 205 F.Supp. 627, 630 (E.D.N.Y.1961). *See generally* 4 A. Corbin, Contracts §§ 779D, 790–791; 2 S. Williston, (3d ed. W. Jaeger 1959) § 402; 17 Am.Jur.2d § 307, at 732.

**18.** Ogden/Dwight argues that a different outcome would result were we to adopt the "intended beneficiary-incidental beneficiary" analysis of Restatement Second of Contracts § 133 (Tent. Draft 1973). However, Illustration 9 of First Restatement § 133, discussed in the text, is retained in the Restatement Second as Illustration 3, indicating that appli-

588

We see no basis on the present record for our going further than did the Court in *Tomaso, Feitner & Lane, Inc. v. Brown*, 4 N.Y.2d 391, 175 N.Y.S.2d 73, 74–75, 151 N.E.2d 221 (1958) (*per curiam*) and authorities cited therein.

It was the University which here proffered its own undertaking to qualifying contestants who failed to receive the contract.[19] The University had represented its intention to cover its own expenses and thereafter to distribute the remaining balance to qualifying contestants such as Ogden/Dwight. What the University might have chosen to do following a forfeiture represented in no way a promise by Pankow to confer a direct benefit upon Ogden/Dwight or to the six other contestants who originally had submitted parallel obligations and who likewise might have qualified had they not withdrawn. The instant contract contained no promise to make such contestants direct beneficiaries of Pankow's obligation.

■■ In sum, the law of New York contemplates that suit may not be maintained by those who are merely incidental beneficiaries. Rather, a contract is to be enforced only by those who are parties to it and by those who are its direct beneficiaries.[20] Thus is reflected the general law discussed in *Ger. Alliance Ins. Co. v. Home Water Co.*, 226 U.S. 220, 230, 33 S.Ct. 32, 57 L.Ed. 195 (1912):

> Before a stranger can avail himself of the exceptional privilege of suing for a breach of an agreement, to which he is not a party, he must, at least show that it was intended for his direct benefit. For, as said by this court, speaking of the right of bondholders to sue

a third party who had made an agreement with the obligor to discharge the bonds, they "may have had. an indirect interest in the performance of the undertakings, but that is a very different thing from the privity necessary to enable them to enforce the contract by suits in their own names." (Citations omitted.)[21]

We are satisfied that Judge Tenney correctly discerned the problem herein presented.

The judgment is affirmed.

cation of the new Restatement here probably would not change the result.

19. *See* footnote 5, *supra*.

20. Haran v. Hand, 37 App.Div.2d 291, 324 N.Y.S.2d 556, 558 (1st Dep't 1971); *cf.* Shaw v. E. I. DuPont De Nemours & Co., 124 Vt. 304, 204 A.2d 159, 161 (1964) citing Seaver v. Ransom, 224 N.Y. 233, 120 N.E. 639 (1918); *and see* Fosmire v. National Surety Co., 229 N.Y. 44, 48, 127 N.E. 472 (1920).

21. *See* reference to *Ger. Alliance Ins. Co.*, *supra* and discussion by Cardozo, J., in Moch Co. v. Rensselaer Water Co., 247 N.Y. 160, 168, 159 N.E. 896, 898–899 (1923); Quirke v. Chessie Corp., 368 F.Supp. 558, 561 (S.D.N.Y. 1974); DeGioia v. United States Lines Company, *supra* note 17; *compare* Johnson Farm Equipment Company v. Cook, 230 F.2d 119, 124 (8 CA 1956).