Vermont Superior Court
Filed 02/18/25
Addison Unit

VERMONT SUPERIOR COURT
Addison Unit
7 Mahady Court
Middlebury VT 05753
802-388-7741
www.vermontjudiciary.org



CIVIL DIVISION
Case No. 23-CV-04676

---

**AC Wright LLC v. Wind River Environmental, LLC et al**

---

## ENTRY REGARDING MOTION

Title:         Motion for Summary Judgment; Motion for Summary Judgment (Def); (Plf)
(Motion: 5; 6)
Filer:        John M Mazzuchi; Walter E. Judge
Filed Date:    October 28, 2024; November 26, 2024

    This case involves potential violations of the liquidated damages clause of a contract between two septic pumping companies—AC Wright, LLC ("AC Wright") and Wind River Environmental, LLC. ("Wind River"). The contract covers Wind River's agreement to refrain from sending solicitation emails to customers of AC Wright who appear on a designated list. The parties have cross-moved for summary judgment, with AC Wright asserting the language in the contract clearly and unambiguously entitles them to relief. Wind River disagrees and argues that the contract is ambiguous, unreasonable, and that the existence of a breach is debatable.

Undisputed Facts

    AC Wright is a Vermont limited liability company with a principal place of business in Bristol, VT. Answer ¶ 1. Wind River is a Delaware corporation with a principal place of business in Marlboro, Massachusetts. Ans. ¶ 2. Both companies currently provide septic tank pumping services to customers in Vermont. *Id*. ¶ 19. Rodem, Inc. is an inactive Vermont corporation owned by Michael and Kelly Medor, two of the other named defendants in this suit. *Id*. ¶ 3, Business Search, Business Services Division, Vermont Secretary of State (Feb. 10, 2025), https://bizfilings.vermont.gov/business/businesssearch. Clark Rubbish Removal Inc. is an inactive Vermont corporation and the parent company of "Clark Septic Service," a former septic service company located in Bristol, VT. Ans. ¶ 11, Business Search, Business Services Division, Vermont Secretary of State (Feb. 10, 2025), https://bizfilings.vermont.gov/business/businesssearch.[1]

    In May 2013, Clark Rubbish Removal, Inc., sold assets used in the operation of Clark Septic Service to Rodem. Ans. ¶ 12. These assets included a "2013 Customer List" ("Customer List"). *Id*. In September 2013, Rodem conveyed assets from Clark Septic Service to AC Wright, including the Customer List. *Id*. ¶ 14. In 2018, Wind River Environmental purchased all of Rodem's assets. *Id*. ¶ 17. During the resulting exchange, Wind River came into possession of Clark Septic Service's Customer List.

---

[1] Publicly available information regarding the status of Vermont corporations is posted on the Business Services Division of the Vermont Secretary of State's website at https://sos.vermont.gov/corporations/, and can be found using a "business search" at https://bizfilings.vermont.gov/business/businesssearch.

*Id.* ¶ 18.[2] At some point after the purchase of Rodem, Wind River sent notices to former customers of Clark Septic Service about septic tank services. Compl. ¶ 19, Ans. ¶ 19.[3]

In the hope of resolving disputes created by the contact from Wind River to former customers of Clark Septic, the parties entered into a Settlement Agreement in July 2022. Ans. ¶ 20, Def. Response to Plaintiff Statement of Undisputed Material Facts, filed 1/6/2025, ¶ 1. Counsel for Plaintiffs, John Mazzuchi, Esq., prepared the "Settlement Agreement." Def. Re: Plf.'s SUMF ¶ 11; Ex. 1 to Cross-Motion for Summary Judgment, filed 11/26/2024. The Agreement provided that Wind River "shall immediately cease making any use of the Customer List, including . . . sending notices," however, that "while not through use of the Customer List . . . Wind River shall not be precluded from general marketing efforts that may reach Wright's customers in the normal course of business." Ans. ¶ 21. The Agreement stated that "liquidated damages for each such violation would be $750 . . . ." *Id.* The agreement does not define what constitutes a violation. Def. Ex. A to Motion for Summary Judgment, p. 2; Def.'s Opposition to Plaintiff's Motion for Summary Judgment, filed 11/26/2024, p. 12.

In their negotiations leading up to finalizing the Settlement Agreement, the parties discussed the amount of liquidated damages in terms of the revenue and profit from a single septic tank pumping. Ex. 4 to Plaintiff's First Motion for Summary Judgment, filed 11/8/23, p. 1–2. Although the parties ultimately agreed on an amount of damages that would result from a violation, the relevant emails do not show consensus around how damages are to be calculated or the threshold for an infraction of the Agreement. *Id.*

Both parties agree that AC Wright charges $350 for pumping a septic tank under 1,000 gallons and makes a profit of approximately $150 per pumping. Def. Response to Plaintiff's SUMF in Support of Cross Motion, filed 1/6/2025, ¶ 8. Septic tank pumping is the service AC Wright performs most regularly. *Id.* ¶¶ 4–6. Other septic services can have a much higher cost and result in greater profit, but AC Wright does not perform those services on any regular basis. *Id.*

In 2022, prior to the execution of the Settlement Agreement, Wind River began an internal effort to verify contact information for customers in its database for which it did not have email addresses. Def. Ex. A to Motion for Summary Judgment, p. 4–5; Plaintiff's Ex. 2 to Cross-Motion for Summary Judgment, p. 2. The company conducted this campaign using a third-party emailer application. *Id.* Wind River aggregated the data they planned to use as the foundation of their email verification campaign prior to the execution of the Settlement Agreement, which included some names that would later appear on the agreed-upon customer list. *Id.* This resulted in Wind River sending emails to 93 individuals whose names appear on the customer list identified in the Settlement Agreement, after the Agreement had been executed. Ex. E to Def.'s SUMF in Support of Summary Judgment, filed 10/28/2024, Answer No. 1. Of those 93 recipients, 28 individuals opened the email, and one contacted AC Wright regarding the communication. *Id.* The Customer List contains more than 1,000 customers. Opposition, p. 10. The email in question asked recipients to "Please confirm your account information" and provided an option for indicating they were not a customer of Wind River. Defendants' Opposition to Plaintiff's Cross-Motion, filed 1/6/2025, p. 4–5.

After AC Wright learned an email had been sent to the email address of an individual on the customer list (but brought to their attention by a different individual), their counsel reached out to Wind River regarding the incident. Def. Ex. A to Motion for Summary Judgment, p. 4–5. Initially, counsel

---

[2] The parties dispute whether Rodem's conveyance of the Customer List to Wind River was intentional. Ans. ¶ 18.
[3] During this transaction, Rodem owned and operated another entity named "Drummac Septic Services," a name that Wind River kept when it acquired Rodem. For clarity, the court will refer to all entities owned by Rodem as "Rodem" and to those owned by Wind River as "Wind River." Ans. ¶¶ 13, 16.

requested $750 and an explanation of how the violation occurred. After Wind River's CFO offered an explanation and assurances that the problem had been rectified, AC Wright declined to accept the original amount and instead requested $750 for each customer contacted during Wind River's email campaign. *Id*. at 3. During their conversation, both parties affirmed that the Settlement Agreement's liquidated damages provision did not establish whether the amount would be owed "'per customer [contacted]'" or "'per email campaign.'" *Id*. at 2. After the parties failed to agree on interpretation of the clause, AC Wright filed suit in November 2023.

Summary Judgment Standards

A party is entitled to summary judgment if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." V.R.C.P. 56(a). A fact is material "'if it might affect the outcome.'" *In re Estate of Fitzsimmons*, 2013 VT 95, ¶ 13, 195 Vt. 94 (quoting *N. Sec. Ins. Co. v. Rossitto*, 171 Vt. 580, 581 (2000) (mem.)). Allegations made in opposition to the motion, if supported by admissible evidence, are regarded as true when determining if a genuine issue of material fact exists. *Morisseau v. Hannaford Bros.*, 2016 VT 17, ¶ 12, 201 Vt. 313. The benefit of reasonable doubts and inferences goes to the nonmoving party. *Id*. "'Where the moving party does not bear the burden of persuasion at trial, it may satisfy its burden of production by showing the court that there is an absence of evidence in the record to support the nonmoving party's case. . . The burden then shifts to the nonmoving party to persuade the court that there is a triable issue of fact.'" *Boulton v. CLD Consulting Eng'rs*, 175 Vt. 413, 417 (2003) (quoting *Ross v. Times Mirror, Inc.*, 164 Vt. 13, 18 (1995)). "'The nonmoving party may survive the motion if it responds with specific facts raising a triable issue, and it is able to demonstrate sufficient evidence to support a prima facie case.'" State v. G.S. Blodgett Co., 163 Vt. 175, 180 (1995) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 324 (1986)). "'If the nonmoving party fails to establish an essential element of its case on which it has the burden of proof at trial, the moving party is entitled to summary judgment as a matter of law.'" *Washington v. Pierce*, 2005 VT 125, ¶ 17, 179 Vt. 318 (quoting *G.S. Blodgett*, 163 Vt. 175 at 180).

Analysis

AC Wright contends that Wind River unequivocally "ma[de] use" of the Customer List as prohibited by the Settlement Agreement when they sent emails to 93 customers whose names appeared on the identified list. Ex. 1 to Plaintiff's Cross-Motion, p. 1; Plaintiff's Reply to Def.'s Response to Plf.'s SUMF in Support of Cross-Motion, filed 1/17/2025, p. 3. It argues the clause in the Agreement permitting "general marketing efforts" does not cover the email in question because the clause includes the phrase "*while not through use of the Customer List* . . . Wind River shall not be precluded from general marketing efforts . . . ." *Id*. (Emphasis added). AC Wright contends that Wind River has already admitted in their responses to interrogatories that they made use of the Customer List, and that the meaning of the phrase "make use" is sufficiently clear to qualify Wind River's conduct as an unambiguous violation. Plaintiff's Reply to Def.'s Response, filed 1/17/2025, p. 3. Further, they assert that the phrase "liquidated damages for each such violation would be $750" can support only one possible meaning—that "each such violation" refers to $750 per customer contacted, and as a result, Wind River owes AC Wright $69,750 in damages, plus attorney's fees. Cross-Motion, p. 8.

Wind River responds that critical parts of the Settlement Agreement are ambiguous, that the liquidated damages provision is an unenforceable penalty, and that a reasonable jury could find that their conduct did not constitute a breach. Opposition to Cross-Motion, p. 3–4. It argues that there was neither a breach of the Agreement in a technical sense nor in the sense of the broader purpose of the Agreement. Opposition to Cross-Motion, p. 6. From the technical side, they assert:

[U]nbeknownst to Wind River—the Medors had not purged the names on the 2013 Customer List from their customer database . . . because those names [were] integrated into the Wind River customer database and subsequently extracted during planning for [the email address verification campaign] and prior to the execution of the Settlement Agreement, ninety-three (93) names on the 2013 Customer List were inadvertently included . . . in the campaign . . . .

Motion, p. 5.

Alternatively, they argue that the email in question should fall within the section of the Settlement Agreement permitting "'general marketing efforts . . . .'" Opposition to Cross-Motion, p. 6. Wind River asserts that the email should not be regarded as a solicitation because: the email does not mention AC Wright; did not ask recipients to become customers of Wind River; only asked for up-to-date contact information; and provided an option for recipients to indicate they were not customers of Wind River. Motion p. 6; Opposition to Cross-Motion p. 6–7. Wind River contends that AC Wright has suffered no damages because of its actions, and thus cannot maintain a claim for breach of contract. Motion, p. 18–19. They build on this claim to assert generally that liquidated damages are not available to a party that has suffered no actual damages. Motion, p. 21.

**Ambiguity in Settlement Agreement**

A writing will be found to be ambiguous when reading the text in isolation "supports a different interpretation from that which appears when read in light of the surrounding circumstances, and both interpretations are reasonable." *Isbrandtsen v. N. Branch Corp.*, 150 Vt. 575, 579 (1988). When a contract is found to be ambiguous, it should be "construed against the party who drafted it." *State v. Spitsyn*, 174 Vt. 545, 547 (2002).

Wind River argues that the Settlement Agreement's liquidated damages clause is subject to more than one reasonable interpretation, and that the resulting ambiguity should be construed against AC Wright because their counsel drafted the Agreement. Reply in Support at 10–12; Opposition to Cross-Motion p. 10–13. AC Wright counters that the Settlement Agreement could only support an interpretation "that AC Wright is entitled to $750 in liquidated damages per violation of the Agreement, and that each message sent to a customer on the Customer List is a separate violation." Opposition, p. 9. In AC Wright's view, the fact that the Settlement Agreement states "each such violation" would result in liquidated damages so clearly supports the interpretation that damages should be calculated based on the number of individual emails sent to each customer that any other interpretation is absurd. *Id*. at 8.

The court finds that a reasonable jury could conclude that critical portions of the Settlement Agreement are susceptible to more than one reasonable interpretation. A reasonable jury could find both readings of the terms "make use" in paragraph 2 and "violation" in paragraph 4 advanced by the parties to be plausible. Section 2 of the Agreement states in part, "Wind River shall immediately cease making any use of the Customer list . . . ." Ex. 1 to Cross-Motion, p. 1. Section 4 states, "In the event Wind River fails to comply with its obligations under the Agreement . . . liquidated damages for each such violation would be $750." *Id*. at 2. This is the only time the word "violation" appears in the Settlement Agreement. *Id*. This necessarily invites the question of what constitutes a violation. AC Wright argues "it is a 'violation' of the Settlement Agreement for Wind River to make use of the Customer List." Opposition at 9. Although this definition makes sense on a superficial level, it falls apart when exposed to closer examination.

First, AC Wright is using terms that should have been defined in the Settlement Agreement to define other terms in the Settlement Agreement. Perhaps the most flagrant example can be seen in AC Wright's Opposition to Defendant's Motion, where it states: "The contract prohibits Wind River from making any "use" of the Customer List. Contacting a single customer on the Customer List would be "use" of the Customer List and thus a violation." *Id.* There is no problem with this definition of "use," aside from the fact that it does not appear anywhere in the Settlement Agreement. Had this language been inserted into the original Agreement, it would be clear that "contacting" anyone on the Customer List is to make the type of "use" of the list that constitutes a "violation." *Id.*

Unfortunately, retroactive drafting cannot make an ambiguous contract unambiguous. As things stand now, the language of the Settlement Agreement allows for interpretations beyond the one AC Wright offers, particularly considering the provision permitting "general marketing efforts" by Wind River. Ex. 1 to Cross-Motion, p. 1. This is a type of contact with individuals on the Customer List that is permitted; as such, to assert that the prohibition on making use of the Customer List clearly indicates no contact with customers inevitably creates ambiguity. AC Wright points to the clause "while not through use of the Customer List . . . ." as a qualification that sufficiently clarifies situations where contact is permitted. However, the contract provides no mechanism for distinguishing between permitted and prohibited contact. *Id.* To an outside observer, a situation where Wind River made use of the list to contact a customer could look identical to a situation that would not violate the contract. For example, Wind River could contact an individual on the List after coming into possession of their contact information through some other means; this would engender a situation where Wind River had contacted an individual "not through use of the Customer List" that would be indistinguishable from prohibited contact without further clarification. *Id.*

Given the subject matter of the Settlement Agreement and the diverging characterizations of the alleged violation, clarity around the meaning of "make use" becomes even more important in assessing a jury's potential reaction to the facts at issue. The subject matter in this case is a collection of names and addresses on a spreadsheet. Ex. 2 to Plaintiff's First Motion, filed 11/8/23. Colloquially speaking, one could arguably "make use" of this data in several different ways that a reasonable juror could find equally plausible. AC Wright's interpretation—that each email qualified as a "use" of the list and represented a discrete instance of prohibited contact—is one such plausible interpretation. Opposition p. 9. However, a reasonable juror could find Wind River's interpretation to be equally plausible. In their telling, they uploaded the customer data they received in their acquisition of Rodem's assets into their database, unaware that individuals on the Customer List had not been removed.[4] Motion p. 5; Reply in Support p. 3. Upon beginning their email verification campaign—prior to the execution of the Agreement—they generated a list from this same database of customers without confirmed emails, which included the 93 individuals that appeared on the Customer List. *Id.* Wind River then used this list to send emails asking recipients to verify their contact information. *Id.*

Even under the broadest definition of "use", a reasonable juror could find that uploading information into a database, generating a new list using that information, and then sending emails based on that list does not qualify as a "use" of the original list, or at least not 93 separate uses. For example, Wind River suggests that because this was a mass email sent to all recipients automatically and simultaneously, the event could be construed as a single "use" of the Customer List and a thus a single violation. Reply in Support, p. 11; Opposition to Cross-Motion, p. 3. While the court makes no decision about which interpretation is more plausible, a juror could find that either is at least reasonable. Thus, the provision is ambiguous. *Isbrandtsen v. N. Branch Corp.*, 150 Vt. 575, 579 (1988).

---

[4] Should a jury find Wind River's characterization of events credible, it appears entirely possible that Wind River would not have any reason to know of the Customer List prior to the Settlement Agreement unless Rodem had explicitly mentioned their prior deal with Clark Septic Service.

**Existence of Breach**

Due to the ambiguity in the Agreement, the existence of a breach becomes a factual question that requires resolution by a jury. The Vermont Supreme Court recently affirmed that "when an agreement is ambiguous, the parties' intent becomes a question of fact." *Beldock v. VWSD, LLC*, 2023 VT 35, ¶50, 218 Vt. 144 (citations omitted).

The parties disagree about what took place, whether Wind River's actions constitute a "use" of the Customer List, and whether the email fell within the contact allowed by the Agreement. Wind River argues that prior to having any awareness of the customers on the Customer List and before making an agreement with AC Wright, they used data received from the Medors to generate a list of customers missing contact information. Motion p. 5, Opposition to Cross-Motion p. 4. They used this list as the basis for an email address verification campaign after signing their agreement with AC Wright and contend that they "never specifically intended to contact anyone who was on the 2013 Customer List." Motion p. 5.[5] Additionally, they argue that the email in question should fall within the permissible contact allowed by the Agreement. Opposition to Cross-Motion, p. 4.

AC Wright claims that this series of events unequivocally qualifies as a use of the Customer List, and that the only valid reading of the Agreement "counts each message sent to a customer on the Customer List as a separate violation of the Settlement Agreement." Opposition to Motion, p. 10. They appear to base this entirely on their reading that "Contacting a single customer using the Customer List would be "use" of the Customer List and thus a violation." *Id*. at 9. AC Wright does not appear to address Wind River's argument about the content of their email. It only argues that the Agreement prohibits any use of the Customer List, the facts that Wind River has admitted constitute an admission to using the List, and thus Wind River has violated the Settlement Agreement. *Id*. at 4.

The diverging accounts of what transpired, interpretation of the clause permitting contact with individuals on the Customer List, and a jury's perception of Wind River's email represent genuine disputes of material fact that should not be resolved by the court at the summary judgment stage. *Beldock v. VWSD, LLC*, 2023 VT 35, ¶50. A jury will be better able to judge the credibility of witnesses and to interpret contractual language according to its plain meaning. *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000) (quotation omitted). Further, a jury will be able to examine the email at issue from Wind River and make a judgment about whether it falls outside of contractual boundaries. *Id*.

**Liquidated Damages Clause**

In Vermont, a liquidated damages clause requires that:

> (1) because of the nature or subject matter of the agreement, damages arising from a breach would be difficult to calculate accurately; (2) the sum fixed as liquidated damages must reflect a reasonable estimate of likely damages; and (3) the provision must be

---

[5] AC Wright makes only one claim against Wind River for breach of contract. Intent is not an element of a breach of contract claim; thus, the court will not consider it here. See *Kim v. Lee*, 576 F. Supp. 3d 14, 34 (S.D.N.Y. 2021), aff'd, No. 22-61, 2023 WL 2317248 (2d Cir. Mar. 2, 2023) ("There is generally no good-motive intent defense to a claim for breach of contract."); *Morse v. Donati*, 2019 IL App (2d) 180328, 136 N.E.3d 1043, 1052 ("A breach of contract is not considered a tort because intent or the willfulness of the breach is not relevant.") (citation omitted); *Telecom Acquisition Corp. I v. Lucic Ents.*, Inc., 2016-Ohio-1466, 62 N.E.3d 1034, 1044 ("whether a party intentionally breached a contract is not an element that must be proven to substantiate a breach of contract claim.")

intended solely to compensate the nonbreaching party and not as a penalty for breach or as an incentive to perform.

*Renaudette v. Barrett Trucking Company*, 167 Vt. 634, 635 (1998) (quoting *New England Educational Training Service, Inc. v. Silver Street Partnership*, 156 Vt. 604, 613).

 *Renaudette v. Barrett Trucking Company*, 167 Vt. 634 (1998) also established that a liquidated damages clause must be assessed for reasonableness "at the time the contract is entered into and not after the contract has been breached." *Renaudette*, 167 Vt. 635. However, it must be noted that "the ultimate test for the validity of a liquidated damages clause is whether the clause is reasonable under the totality of the circumstances," and that while the factors enumerated in *Silver Street* provide an important analytical framework, they "are not necessarily exclusive or conclusive." *Highgate Associates Limited v. Merryfield*, 157 Vt. 313, 316 (1991). The amount must be "'a reasonable forecast of just compensation for the damage caused by a breach of contract," and will be set aside as a penalty if it is found that the primary function of the clause is "to serve only as an added spur to performance" and not as reasonable compensation for the damaged party. *Ogden Development Corporation v. Federal Insurance Co.*, 508 F.2d 583, 586 (2d Cir. 1974).

 AC Wright argues that the liquidated damages clause in the Settlement Agreement is valid because their damages are difficult to calculate, they reflect a reasonable estimate of likely damages, and that the clause is not a penalty or incentive to perform. See Plaintiff's SUMF in Support of Cross-Motion p. 2–3 (noting the variability of septic services and costs); Ex. 4 to Plaintiff's First Motion, p. 1 (offering an explanation for the reasonableness of the $750 figure); Ex. 1 to Plaintiff's Cross-Motion, filed 11/26/24, p. 2 (stating liquidated damages clause "does not act as a penalty.") They reject the idea that actual damages are required for a liquidated damages clause to take effect.

 Wind River argues that the liquidated damages clause, as interpreted by AC Wright, constitutes an unenforceable penalty. Reply in Support of Motion, filed 1/6/2025, p. 12; Opposition to Cross-Motion p. 10. As noted above, they further argue that "'the party seeking to enforce the [liquidated damages] provision must necessarily have been damaged in order for the provision to apply.'" Reply to Opposition, p. 9 (citing *Rubin v. Napoli Bern Ripka Shkolnik*, LLP, 179 A.D.3d 495, 496, 118 N.Y.S.3d 4 (2020)). They cite the Restatement (Second) of Contracts, § 356, in support of their position. See Restatement (Second) of Contracts, § 356, cmt. b, Ills. 3 & 4.

 The parties correctly articulate opposing sides of a judicial split on the time at which the reasonableness of a liquidated damages provision should be judged.[6] Joseph D. West and Michael B. Hissam, *The Reasonableness of Liquidated Damages Provisions—Why Only the Look Back Approach Can Prevent Windfalls*, 4 No. 1 Journal of the American College of Construction Lawyers (2010). AC Wright correctly notes that *Renaudette* controls the law of liquidated damages in Vermont and the state does not permit a reassessment of the reasonableness of a liquidated damages provision in light of the amount of actual damages suffered. *Renaudette*, 167 Vt. 635. However, this does not mean the court must blindly give its blessing to any liquidated damages clause both parties have agreed upon. The court may still assess the reasonableness of the required factors based on the events occurring at the time the parties entered their agreement, as the court did in *Renaudette*. *Id*. There, Vermont's Supreme Court found the

---

[6] "[T]he "single look" approach assess[es] reasonableness exclusively from the moment of contract formation and bar the fact-finder from considering actual damages . . . a fewer number of courts . . . employ what is called the "second look" approach, which permits a retrospective analysis." Joseph D. West and Michael B. Hissam, *The Reasonableness of Liquidated Damages Provisions—Why Only the Look Back Approach Can Prevent Windfalls*, 4 No. 1 Journal of the American College of Construction Lawyers 1, 21 n. 9 (2010) (citing *Renaudette* as an example of a court employing "single look" model).

liquidated damages provision to be reasonable. The court based its conclusion on findings that damages would have been difficult to calculate at the time of contracting and a $4,000 penalty was not disproportionate to a $170,000 real estate purchase. *Id.* at 636–37. In assessing whether the clause constituted a penalty, the court viewed the amount of damages in proportion to the total amount of the purchase, a technique repeated by Vermont's federal district court. *Heath Knolls Investments, Inc. v. Westlake Residential Partners, LLC*, No. 2:07-CV-049, 2008 WL 1902066, at *5 (D. Vt. Apr. 25, 2008).

*Difficulty of Estimation*

In terms of the first factor, the court finds that a jury could conclude that AC Wright's expenses were difficult to estimate. Evidence provided by AC Wright supports the contention that their customers have a wide variety of different septic needs that fluctuate throughout the year. SUMF in Support of Cross-Motion ¶¶ 3–10. As a result, a jury could conclude that it would be difficult to estimate the amount of damages from the loss of a single customer because it would have been difficult to assess each customer's unique needs and the corresponding revenue generated.

*Reasonableness of Estimate of Likely Damages*

But regardless of this variability of costs, this court finds that a reasonable jury could conclude that the Settlement Agreement's liquidated damages provision did not represent a reasonable estimate of likely damages at the time the contract was formed, and thus primarily functioned as a penalty. A jury could so find because the amount imposed for a breach of the Agreement lacks any real relation to the damage AC Wright would suffer for the loss of a customer, much of AC Wright's justification for the amount is conjecture, and certain features of the agreement, such as its indefinite duration, make the agreement an unconscionable penalty.

AC Wright has repeatedly claimed in their motions that the $750 per violation figure comes from "reference to the hypothetical loss of a single customer . . . ." Opposition at 11.[7] Even if the court were to put aside the admission by AC Wright's counsel "that the contract itself does not specify whether the liquidated damages figure is 'per customer' or 'per email campaign,'" the substance of the correspondence between AC Wright and Wind River casts doubt on this assertion. Ex. A to Def. Motion for Summary Judgment, filed 10/28/24, p. 2. In the course of their correspondence attached as Exhibit A to Wind River's motion for Summary Judgment, AC Wright included a screenshot of an email sent by counsel to representatives for Wind River on August, 19, 2019. In negotiating the liquidated damages provision, counsel for AC Wright wrote:

> "Chad [Wright] is unwilling to reduce [liquidated damages] to $500. While a pumping may only cost $300-$400, *Clark-Wright provides a number of other services which can cost substantially more, and Chad had settled on $1000 as an average figure*."

*Id.* at 2 (emphasis added).

The import of this statement is twofold. First, if $750 is an average of all of AC Wright's services that was reduced in negotiation, it cannot be the case that the number derives from the profit or gross revenue of one regular septic pumping service call. See Cross-Motion, filed 11/26/2024, p. 5 ("AC Wright charges $350 per pumping and makes approximately $150 of profit per pumping.") Second, if it is

---

[7] In email correspondence, counsel for AC Wright noted: "On that front, the liquidated damages provision is probably more than the profit from a single service call, but it *should be*—if Wind River services a Clark-Wright customer, there is a risk that Clark-Wright loses that customer permanently." Ex. 1 to Memo in Opposition, filed 11/26/24, p. 1.

the case that the $750 number is not based on the profit from AC Wright's most widely used and frequently performed service, it becomes much more likely that a jury could find that this number did not represent a reasonable estimate of likely damages, but was instead "only an added spur to performance." *Ogden Dev. Corp. v. Fed. Ins. Co.*, 508 F.2d 583, 586 (2d Cir. 1974).

As the clause stands now, $750 represents every possible service AC Wright could provide to a customer, ranging from $250-$50,000. Cross-Motion at 5–6. It appears obvious that not every customer would require every service AC Wright offers. Other customers would only have need for some of these services one time, such as septic system installation ($30,000-$50,000). *Id.* AC Wright emphasizes that their customers have widely varying needs, noting that "some customers with full-time residences only need a septic pumping every three years, while customers with seasonal residences need a pumping much more often—on average, once every three weeks." *Id.* at 6.

Having damages that are difficult to measure does not represent an invitation to measure potential damages using the most profitable scenario AC Wright can imagine. AC Wright notes that, depending on the type of septic tank, a customer could generate anywhere from $50/year to $750/year in profit without providing any estimates of the number of each type of customers on the list. *Id.* Although this data is not required, its absence underscores the enormous variability of AC's Wright's potential profits as they describe them. For example, pumping for 500 customers with full-time residences could generate an annual profit of $25,000, while pumping for 500 customers with seasonal residences could generate $375,000. AC Wright described similarly wide ranges for other services, which is important in the context of their asserted interpretation of the liquidated damages clause. *Id.* at 6. AC Wright's $750 per customer figure bakes in the assumption that most of their customers will use a significant percentage of their services over the course of their relationship with the company, so they are justified in charging an average of all their services for a single contact that has the potential to result in the loss of a single customer. They provide no evidence that this is the case. As such, a reasonable juror could conclude the figure did not represent a reasonable estimate of likely damages at the time the Agreement was formed.

Looking at the $750 figure in the context of other liquidated damages amounts the court has found reasonable reinforces that a jury could find that the number was unreasonable at the time of contracting and functioned as a penalty. *Renaudette* concerned a $4,000 damages clause in a contract for a $170,000 real estate transaction, or around 2.4% of the purchase price, which the court found to be reasonable. *Renaudette v. Barrett Trucking Co.*, 167 Vt. 634 (1998). In *Heath Knolls Investments*, *Inc.*, No. 2:07-CV-049, 2008 WL 1902066, Vermont's federal district court reaffirmed the Vermont Supreme Court's 10% ceiling for liquidated damages provisions. *Heath Knolls Invs., Inc.*, No. 2:07-CV-049, 2008 WL 1902066, at *5 (D. Vt. Apr. 25, 2008). As noted above, AC Wright asserts that the number is per customer in part because their representative and Wind River's representative discussed the number in the context of the hypothetical loss of a single customer. Opposition at 11. Scaled down to the level of the individual, $750 alternatively represents either 500% of the profit or just over 200% of the total revenue from a single pumping call. A customer would have to spend $7,500 with AC Wright before the company's liquidated damages clause fell within the parameters laid out by the Vermont Supreme Court. Although some of AC Wright's customers may well spend that amount, they have provided no evidence to show that this is the case.

*Classification as Penalty or Incentive*

Finally, AC's Wright's liquidated damages clause lacks any reasonable ceiling to guard against an unwarranted exponential increase in damages. It does not have an expiration date, any method for distinguishing permissible contact with a customer, or an acknowledgement of the possibility that an individual on the customer list could legitimately decide to switch their septic service to Wind River for

reasons unrelated to solicitation emails. Ex. 1 to Opposition, filed 11/26/2024. All these factors increase the likelihood that a reasonable juror could find that the clause functioned as a penalty. In large part, this is because the absence of these parameters in the contract dramatically increase the chances of a situation where the amount owed by Wind River has no relation to any amount of damage that could reasonably have been estimated by AC Wright. *New England Educ. Training Serv., Inc. v. Silver St. P'ship*, 156 Vt. 604, 613 (1991).

AC Wright asserts that because Wind River sent 93 emails to contacts on their Customer List, Wind River owes them nearly $70,000. Cross Motion at 8. Wind River responds that the email they sent fell within the clause of the Settlement Agreement allowing "general marketing efforts . . . ." and thus does not constitute a violation. Ex. 1 to Cross-Motion, p. 1; Motion at 7. AC Wright discovered Wind River had contacted customers on the customer list because they were notified by a third party. Def. SUMF in Support of Motion, at 7. Although these are not the facts of this case, it is entirely conceivable that Wind River could have sent another round of arguably permissible emails, fully under the impression they were complying with the Agreement, before AC Wright was notified. In AC Wright's view, this would entitle them to nearly $140,000 regardless of the content of the emails and whether they were opened. Based on the way AC Wright asserts the contract operates, there would be no upper limit on the amount of money that Wind River could owe, nor would there be any time limit on how long after the fact AC Wright could demand payment. Cross-Motion at 8. Regardless of how difficult AC Wright's profits are to estimate, a contract of indefinite duration with no upper limit simply cannot be a reasonable estimate of likely damages. *New England Educ. Training Serv., Inc.*, 156 Vt. 613 (1991).

**Lack of Damages**

Wind River cites *Smith v. Country Village International*, 2007 VT 132, 183 Vt. 535, in support of the proposition that summary judgment must be granted in their favor because AC Wright admits it has no damages because of their email campaign. Motion p. 19; Opposition to Cross-Motion, 7–8; See *Smith v. Country Village International*, 2007 VT 132, ¶10, 183 Vt. 535 ("Failure to prove damages is fatal to a claim for breach of contract.") AC Wright disputes Wind River's characterization of *Smith* and their asserted admission of no damages:

> AC Wright does not admit that it has 'zero' damages or that it has *not* lost customers, as Defendants repeatedly claim. It is true that AC Wright has not presented affirmative evidence of damages, but that is because, as explained in AC Wright's Cross-Motion for Summary Judgment, it is very difficult to investigate whether AC Wright has lost customers and determine what damages resulted from any lost customers.

Reply to Opposition to Cross-Motion, p. 5.

The Vermont Supreme Court expounded on its holding in *Smith* in *Foti Fuels, Inc. v. Kurrle Corp.*, 2013 VT 111, 195 Vt. 524. After acknowledging that its language in *Smith* "was perhaps overbroad", the court clarified that "Failure to prove damages is fatal not to an action for breach of contract, as it would be for most tort actions, but rather to recovery on the basis of those damages." *Foti Fuels, Inc. v. Kurrle Corp.*, 2013 VT 111, ¶ 38 n. 4, 195 Vt. 524. Around the same time, the court reaffirmed that damages in a breach of contract action must be proved with "reasonable certainty," meaning they cannot be "based on speculation about uncertain future events . . . ." *Madowitz v. Woods at Killington Owners' Ass'n, Inc.*, 2014 VT 21, ¶14, 196 Vt. 47 (*Madowitz II*); *Hedges v. Durrance*, 2003 VT 63, ¶12, 175 Vt. 588. In *Madowitz*, the court rejected a developer's claim of lost profits resulting from a homeowner's associations' opposition to developing additional condominium units in the area. *Id*. ¶ 16. The court found the developer's claim that the association's opposition to the required Act 250 permit

contributed to the denial of the permit (and thus the developer's inability to build more condominium units) to be too speculative. *Id.* The court based this conclusion on its findings that although the permit expired on January 1, 2000, the developer had not started construction by June 1998, and did not obtain one of the requisite local building permits for the development until November 1999. *Id.* ¶¶16–18. As such, he could not claim lost profits from the additional condominium units because it was not clear he would have been able to obtain an extension of the permit, or how many units he would have been able to construct if the permit was granted. *Id.* ¶ 19.

Similar to *Madowitz*, a reasonable juror could find AC Wright's potential damages to be too speculative to permit any recovery. To begin with, AC Wright admits it has presented no affirmative evidence of damages. Reply to Opposition to Cross-Motion, p. 5. Instead, it has presented evidence of the cost of a number of its services, completely divorced from any information about how frequently those services are utilized, or by whom. Cross-Motion, p. 5–6. This is not to say that AC Wright should identify any individual customer or reveal proprietary information, but as things stand, the court has absolutely no basis from which to discern even an approximate value of the information on the Customer List. Some form of this information is required not to compare liquidated damages to actual losses (which as AC Wright correctly notes is not the law of Vermont), but to ensure that a liquidated damages clause represents a reasonable estimate of likely damages. *New England Educ. Training Serv., Inc.*, 156 Vt. 613 (1991). The fact that this list was originally generated more than 11 years ago, in 2013, underscores the speculative nature of AC Wright's demand. Ans. ¶ 14. The last service date shown on the Customer List provided to the court is 8/19/19, more than five years ago, and many customers have much earlier service dates. Ex. 2 to Plf.'s First Motion, filed 11/8/2023, p. 6. Given the passage of time, it could be the case that a significant number of individuals on the Customer List changed their contact information, switched septic providers, or moved by the time the Settlement Agreement was signed, as Sarah Quattrocci did. Ex. 5 to Plf.'s First Motion, filed 11/8/2023, p. 3. Based on the lack of evidence presented to establish that the individuals on the Customer List were customers of AC Wright who actively utilized their services at the time of the Agreement, the court has no way to determine if this is the case.

Conclusion

The reasonableness of AC Wright's liquidated damages clause, whether the clause operates as a penalty, and the existence of a breach all represent disputes of material fact requiring resolution by a jury. For these reasons, both motions for summary judgment are DENIED.

**Signed Electronically on February 17, 2025 pursuant to V.R.E.F. 9(d).**

_____

**David Barra**
**Superior Court Judge**